726 F.2d 1381
 1984-1 Trade Cases 65,879
 LOS ANGELES MEMORIAL COLISEUM COMMISSION, Plaintiff-Appellee,
v.
NATIONAL FOOTBALL LEAGUE, an unincorporated association, et
al., Defendants/Cross-Defendants-Appellants/Cross-Appellees,
and
NEW ENGLAND PATRIOTS FOOTBALL CLUB, INC., Highwood Service,
Inc., Empire Sports, Inc., Houston Oilers, Inc., New York
Jets Football Club, Inc., and Chargers Football Company,
Kansas City Chiefs Football Club, Inc., and Miami Dolphins,
Ltd., Defendants/Cross-Defendants-Appellants,
and
Los Angeles Rams Football Co.,
Defendant/Cross-Defendant-Appellant/Cross-Appellee,
and
Oakland-Alameda County Coliseum, Inc.,
Intervenor/Defendant-Appellant/Cross-Appellee,
v.
OAKLAND RAIDERS, LTD., Cross-Claimant-Appellee/Cross-Appellant.
 Nos. 82-5572 to 82-5574, 82-5664, 82-5665, 83-5714, 83-5732
and 83-5938.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 7, 1983.
Decided Feb. 28, 1984.
 
 Maxwell M. Blecher, Howard F. Daniels, Blecher, Collins & Hoecker, Los Angeles, Cal., for L.A. Coliseum.
 Joseph L. Alioto, Alioto & Alioto, Moses Lasky, Lasky, Haas, Cohler & Munter, San Francisco, Cal., for Oakland Raiders, Ltd.
 Edwin A. Heafey, Crosby, Heafey, Roach & May, Timothy J. Murphy, Oakland, Cal., for Oakland-Alameda County Coliseum, Inc.
 Paul J. Tagliabue, Covington & Burling, Daniel M. Gribbon, Washington, D.C., for NFL.
 William Marshall Morgan, Morgan Wenzel & McNicholas, Los Angeles, Cal., for New England Patriots, et al.
 Appeals from the United States District Court for the Central District of California.
 Before ANDERSON and NELSON, Circuit Judges, and WILLIAMS, District Judge.*
 J. BLAINE ANDERSON, Circuit Judge:
 
 
 1
 These appeals involve the hotly contested move by the Oakland Raiders, Ltd. professional football team from Oakland, California, to Los Angeles, California. We review only the liability portion of the bifurcated trial; the damage phase was concluded in May 1983 and is on a separate appeal. After a thorough review of the record and the law, we affirm.
 
 I. FACTS
 
 2
 In 1978, the owner of the Los Angeles Rams, the late Carroll Rosenbloom, decided to locate his team in a new stadium, the "Big A," in Anaheim, California. That left the Los Angeles Coliseum without a major tenant. Officials of the Coliseum then began the search for a new National Football League occupant. They inquired of the League Commissioner, Pete Rozelle, whether an expansion franchise might be located there but were told that at the time it was not possible. They also negotiated with existing teams in the hope that one might leave its home and move to Los Angeles.
 
 
 3
 The L.A. Coliseum ran into a major obstacle in its attempts to convince a team to move. That obstacle was Rule 4.3 of Article IV of the NFL Constitution. In 1978, Rule 4.3 required unanimous approval of all the 28 teams of the League whenever a team (or in the parlance of the League, a "franchise") seeks to relocate in the home territory of another team. Home territory is defined in Rule 4.1 as
 
 
 4
 the city in which [a] club is located and for which it holds a franchise and plays its home games, and includes the surrounding territory to the extent of 75 miles in every direction from the exterior corporate limits of such city ....
 
 
 5
 In this case, the L.A. Coliseum was still in the home territory of the rams.
 
 
 6
 The Coliseum viewed Rule 4.3 as an unlawful restraint of trade in violation of Sec. 1 of the Sherman Act, 15 U.S.C. Sec. 1, and brought this action in September of 1978. The district court concluded, however, that no present justiciable controversy existed because no NFL team had committed to moving to Los Angeles. 468 F.Supp. 154 (C.D.Cal.1979).
 
 
 7
 The NFL nevertheless saw the Coliseum's suit as a sufficient threat to warrant amending Rule 4.3. In late 1978, the Executive Committee of the NFL, which is comprised of a voting member of each of the 28 teams, met and changed the rule to require only three-quarters approval by the members of the League for a move into another team's home territory.[1]
 
 
 8
 Soon thereafter, Al Davis, managing general partner of the Oakland Raiders franchise, stepped into view. His lease with the Oakland Coliseum had expired in 1978. He believed the facility needed substantial improvement and he was unable to persuade the Oakland officials to agree to his terms. He instead turned to the Los Angeles Coliseum.
 
 
 9
 Davis and the L.A. Coliseum officials began to discuss the possibility of relocating the Raiders to Los Angeles in 1979. In January, 1980, the L.A. Coliseum believed an agreement with Davis was imminent and reactivated its lawsuit against the NFL, seeking a preliminary injunction to enjoin the League from preventing the Raiders' move. The district court granted the injunction, 484 F.Supp. 1274 (1980), but this court reversed, finding that an adequate probability of irreparable injury had not been shown. 634 F.2d 1197 (1980).
 
 
 10
 On March 1, 1980, Al Davis and the Coliseum signed a "memorandum of agreement" outlining the terms of the Raiders' relocation in Los Angeles. At an NFL meeting on March 3, 1980, Davis announced his intentions. In response, the League brought a contract action in state court, obtaining an injunction preventing the move. In the meantime, the City of Oakland brought its much-publicized eminent domain action against the Raiders in its effort to keep the team in its original home. The NFL contract action was stayed pending the outcome of this litigation, but the eminent domain action is still being prosecuted in the California courts.
 
 
 11
 Over Davis' objection that Rule 4.3 is illegal under the antitrust laws, the NFL teams voted on March 10, 1980, 22-0 against the move, with five teams abstaining. That vote did not meet the new Rule 4.3's requirement of three-quarters approval.
 
 
 12
 The Los Angeles Memorial Coliseum Commission then renewed its action against the NFL and each member club. The Oakland-Alameda County Coliseum, Inc., was permitted to intervene. The Oakland Raiders cross-claimed against the NFL and is currently aligned as a party plaintiff.
 
 
 13
 The action was first tried in 1981, but resulted in a hung jury and mistrial. A second trial was conducted, with strict constraints on trial time. The court was asked to determine if the NFL was a "single business entity" and as such incapable of combining or conspiring in restraint of trade. Referring to the reasoning in its opinion written for the first trial, 519 F.Supp. 581, 585 (1981), the court concluded the League was not a "single entity." Vol. 12 Clerk's Record # 931.
 
 
 14
 The district court denied the NFL's motions for change of venue, but did employ a detailed voir dire of the jury pool and of the jurors eventually empaneled. The trial was bifurcated so the jury could first determine liability. In the liability portion, counsel were limited to 40 hours of trial time per side in an effort to narrow the matters presented.
 
 
 15
 The trial was conducted and witnesses called, including owners of various NFL member teams and the League Commissioner, Pete Rozelle. The jury was instructed on the antitrust liability issues and sent out May 6, 1982. On May 7, 1982, the jury returned a verdict in favor of the Los Angeles Memorial Coliseum Commission and the Oakland Raiders on the antitrust claim and for the Raiders on their claim of breach of the implied promise of good faith and fair dealing. The court then continued the case to September 20, 1982, to begin the damages trial.
 
 
 16
 On June 14, 1982, the court issued its judgment on the liability issues, permanently enjoining the NFL and its member clubs from interfering with the transfer of the Oakland Raiders' NFL franchise from the Oakland Coliseum to the Los Angeles Memorial Coliseum. The court determined, in addition, that there was "no just reason for delay in entering this final judgment on plaintiff's and cross-claimant's claim for declaratory and equitable relief, and ... expressly direct[ed] this final judgment be entered." Vol. 16 Clerk's Record # 2090. The NFL and its original clubs immediately appealed the permanent injunction (No. 82-5572); the original clubs of the American Football League also appealed (No. 82-5573), as did the Los Angeles Rams Football Co. (No. 82-5574) and the Oakland-Alameda County Coliseum (No. 82-5664). The Oakland Raiders cross-appealed challenging six orders entered by the court in 1981 and 1982 (Nos. 82-5665 and 83-5398). The NFL and Oakland Coliseum have also appealed the failure of the district court to grant their post-trial motions. (Nos. 83-5714 and 83-5732).
 
 
 17
 The damages trial was completed in May 1983 with the jury returning a verdict awarding the Raiders $11.55 million and the Los Angeles Coliseum $4.86 million. These awards were trebled by the district court pursuant to 15 U.S.C. Sec. 15. The NFL and the other defendants have appealed. (Nos. 83-5907, 83-5908 and 83-5909). This panel will hear and decide the damage appeals. But, because these appeals were expedited, the damage appeals will be decided in a later opinion after briefing, possible argument, and submission.[2]
 
 II. SHERMAN ACT Sec. 1
 
 18
 The jury found that Rule 4.3 violates Sec. 1 of the Sherman Act, 15 U.S.C. Sec. 1. Section 1 literally prohibits every agreement, conspiracy, or other concerted activity in restraint of trade. Since Congress could not have intended that courts invalidate "every" such agreement, see United States v. Joint Traffic Assn., 171 U.S. 505, 19 S.Ct. 25, 43 L.Ed. 259 (1898), most restraints are analyzed under the so-called "rule of reason." Standard Oil of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). The rule of reason requires the factfinder to decide whether under all the circumstances of the case the agreement imposes an unreasonable restraint on competition. Arizona v. Maricopa County Medical Society, 457 U.S. 332, 343, 102 S.Ct. 2466, 2472, 73 L.Ed. 48, 58 (1982).
 
 
 19
 Standard Oil, however, reconciled the earlier categorical prohibition with its own rule of reason by declaring that some restraints remain inherently unreasonable. 221 U.S. at 64-65, 31 S.Ct. at 517. When judicial experience with a particular kind of restraint enables a court to predict with certainty that the rule of reason will condemn that restraint, the court will hold that the restraint is per se unlawful. See United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). In other cases where judges lack the expert understanding of an industry's market structure and behavior to have such certainty, the court will consider facts peculiar to the industry, the nature of the restraint and its effect to determine whether that restraint promotes or restrains competition. See Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683, 687 (1918).
 
 
 20
 In the present case, the district judge found that the unique nature of the business of professional football made application of a per se rule inappropriate. 468 F.Supp. 154, 164-168 (1979). The court therefore instructed the jury that it was to decide whether Rule 4.3 was an unreasonable restraint of trade. The parties do not contest the appropriateness of this basic reasonableness inquiry. The NFL, however, raises two arguments against the lower court's judgment finding section 1 liability. First, the NFL contends that it is a single entity incapable of conspiring to restrain trade under section 1. Second, it insists that Rule 4.3 is not an unreasonable restraint of trade under section 1.
 
 A. Single Entity
 
 21
 The NFL contends the league structure is in essence a single entity, akin to a partnership or joint venture, precluding application of Sherman Act section 1 which prevents only contracts, combinations or conspiracies in restraint of trade. The Los Angeles Coliseum and Raiders reject this position and assert the League is composed of 28 separate legal entities which act independently.
 
 
 22
 The district court directed a verdict for plaintiffs on this issue and as a preliminary matter the NFL states the jury should have been allowed to decide the question. A directed verdict may be granted pursuant to Fed.R.Civ.P. 50(a) when, viewing the evidence in a light most favorable to the nonmoving party, the testimony and all the inferences that the jury could justifiably draw therefrom are insufficient to support any other finding. Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 661 (9th Cir.), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963). When there is no substantial evidence to support a claim, i.e., only one conclusion can be drawn, the court must direct a verdict, even in an antitrust case. Cleary v. Nat'l Distillers and Chemical Corp., 505 F.2d 695, 696 (9th Cir.1974). Our review is de novo. Santa Clara Valley Distributing Co. v. Pabst Brewing Co., 556 F.2d 942, 944 (9th Cir.1977).
 
 
 23
 It is true, as the NFL contends, that the nature of an entity and its ability to combine or conspire in violation of Sec. 1 is a fact question. Murray v. Toyota Motor Distributors, Inc., 664 F.2d 1377, 1379 (9th Cir.), cert. denied, 457 U.S. 1106, 102 S.Ct. 2905, 73 L.Ed.2d 1314 (1982). It would be reversible error, then, to take the issue from the jury if reasonable minds could differ as to its resolution. Id. Here, however, the material facts are undisputed. How the NFL is organized and the nature and extent of cooperation among the member clubs is a matter of record; the NFL Constitution and Bylaws contain the agreement. Based on the undisputed facts and the law on this subject, the district court correctly decided this issue.
 
 
 24
 The district court cited three reasons for rejecting the NFL's theory. Initially, the court recognized the logical extension of this argument was to make the League incapable of violating Sherman Act Sec. 1 in every other subject restriction--yet courts have held the League violated Sec. 1 in other areas. 519 F.Supp. at 583. Secondly, other organizations have been found to violate Sec. 1 though their product was "just as unitary ... and requires the same kind of cooperation from the organization's members." Id. Finally, the district court considered the argument to be based upon the false premise that the individual NFL "clubs are not separate business entities whose products have an independent value." 519 F.Supp. at 584. We agree with this reasoning.
 
 
 25
 NFL rules have been found to violate Sec. 1 in other contexts. Most recently, the Second Circuit analyzed the NFL's rule preventing its member-owners from having ownership interests in other professional sports clubs. North American Soccer League v. National Football League, 670 F.2d 1249, 1257-1259 (2d Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982). It recognized the cooperation necessary among league members, even characterizing the NFL as a joint venture, but nonetheless applied rule of reason analysis and found the cross-ownership rule violated Sec. 1. Other courts have held the League rules governing player contracts violate Sec. 1 of the Sherman Act. Smith v. Pro Football, Inc., 593 F.2d 1173 (D.C.Cir.1978); Mackey v. NFL, 543 F.2d 606 (8th Cir.1976); Kapp v. NFL, 390 F.Supp. 73 (N.D.Cal.1974), appeal vacated, 586 F.2d 644 (9th Cir.1978), cert. denied, 441 U.S. 907, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979). As noted by the Second Circuit in Soccer League, a finding of single entity status would immunize the NFL from Sec. 1 scrutiny:
 
 
 26
 To tolerate such a loophole would permit league members to escape antitrust responsibility for any restraint entered into by them that would benefit their league or enhance their ability to compete even though the benefit would be outweighed by its anticompetitive effects. Moreover, the restraint might be one adopted more for the protection of individual league members from competition than to help the league.
 
 
 27
 670 F.2d at 1257.
 
 
 28
 Cases applying the single entity or joint venture theory in other business areas also contradict the NFL's argument. As stated by the Supreme Court:
 
 
 29
 Nor do we find any support in reason or authority for the proposition that agreements between legally separate persons and companies to suppress competition among themselves and others can be justified by labelling the project a "joint venture." Perhaps every agreement and combination in restraint of trade could be so labeled.
 
 
 30
 Timken Roller Bearing Co. v. United States, 341 U.S. 593, 598, 71 S.Ct. 971, 974, 95 L.Ed. 1199, 1206 (1951). Timken involved an allegation of territorial division among three companies that shared partial common ownership. In Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 141-142, 88 S.Ct. 1981, 1985-1986, 20 L.Ed.2d 982, 992 (1968), the Court reiterated that common ownership will not suffice to preclude the application of Sec. 1. While these cases and others have been the subject of some criticism, see, e.g., M. Handler and T. Smart, The Present Status of the Intracorporate Conspiracy Doctrine, 3 Cardozo Law Review 23 (1981), they remain the law. In recognition that a broad application of Timken and Perma Life could subvert legitimate procompetitive business associations, this circuit has found the threshold requirement of concerted activity missing among "multiple corporations operated as a single entity" when "corporate policies are set by one individual or by a parent corporation." General Business Systems v. North American Philips Corp., 699 F.2d 965, 980 (9th Cir.1983); see Thomsen v. Western Electric Co., 680 F.2d 1263, 1266 (9th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 348, 74 L.Ed.2d 387 (1982); Las Vegas Sun, Inc. v. Summa Corp., 610 F.2d 614, 617 (9th Cir.1979), cert. denied, 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980). The facts make it clear the NFL does not fit within this exception. While the NFL clubs have certain common purposes, they do not operate as a single entity. NFL policies are not set by one individual or parent corporation, but by the separate teams acting jointly.
 
 
 31
 It is true the NFL clubs must cooperate to a large extent in their endeavor in producing a "product"--the NFL season culminating in the Super Bowl. The necessity that otherwise independent businesses cooperate has not, however, sufficed to preclude scrutiny under Sec. 1 of the Sherman Act. In Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), the Supreme Court rejected the assertion that the AP was immune from section 1 because it was a necessary cooperative of independent newspapers which produced a product its individual members could not. Id. at 26, 65 S.Ct. at 1427, 89 L.Ed. at 2034 (Frankfurter, J., concurring). More recently, the Court found the cooperation required among ostensible competitors in arranging blanket licensing of copyrighted songs precluded only a finding of per se illegality; instead, rule of reason analysis was the proper method to determine the legality of the arrangement. Broadcast Music, Inc. v. Columbia Broadcast System, Inc., 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979);[3] see also Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).
 
 
 32
 The case of United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967), is closely on point. Sealy licensed manufacturers to sell bedding products under the Sealy name and allocated territories to the licensees. The facts showed, however, that this arrangement was not vertical but horizontal; the 30 licensees, owning all of the stock of Sealy, controlled all its operations. 388 U.S. at 352-353, 87 S.Ct. at 1849-1850, 18 L.Ed.2d at 1242. Describing the Sealy organization as a joint venture, the Court nonetheless found it a per se violation of the Sherman Act. See also United States v. Topco Associates, Inc., 405 U.S. 596, 609, 92 S.Ct. 1126, 1134, 31 L.Ed.2d 515, 526 (1972) (Court finding a per se violation on facts similar to Sealy).
 
 
 33
 The NFL structure is very similar to that in Sealy. The League itself is only in very limited respects an identity separate from the individual teams. It is an unincorporated, not-for-profit, "association." It has a New York office run by the Commissioner, Pete Rozelle, who makes day-to-day decisions regarding League operations. Its primary functions are in the areas of scheduling, resolving disputes among players and franchises, supervising officials, discipline and public relations. The decision involved here on territorial divisions is made by the NFL Executive Committee which is comprised of a representative of each club. Even though the individual clubs often act for the common good of the NFL, we must not lose sight of the purpose of the NFL as stated in Article I of its constitution, which is to "promote and foster the primary business of League members." Although the business interests of League members will often coincide with those of the NFL as an entity in itself, that commonality of interest exists in every cartel. As in Sealy, we must look behind the label proffered by the defendants to determine the substance of the entity in question. 388 U.S. at 353, 87 S.Ct. at 1850, 18 L.Ed.2d at 1242.
 
 
 34
 Our inquiry discloses an association of teams sufficiently independent and competitive with one another to warrant rule of reason scrutiny under Sec. 1 of the Sherman Act. The NFL clubs are, in the words of the district court, "separate business entities whose products have an independent value." 519 F.Supp. at 584. The member clubs are all independently owned. Most are corporations, some are partnerships, and apparently a few are sole proprietorships. Although a large portion of League revenue, approximately 90%, is divided equally among the teams, profits and losses are not shared, a feature common to partnerships or other "single entities." In fact, profits vary widely despite the sharing of revenue. The disparity in profits can be attributed to independent management policies regarding coaches, players, management personnel, ticket prices, concessions, luxury box seats, as well as franchise location, all of which contribute to fan support and other income sources.
 
 
 35
 In addition to being independent business entities, the NFL clubs do compete with one another off the field as well as on to acquire players, coaches, and management personnel. In certain areas of the country where two teams operate in close proximity, there is also competition for fan support, local television and local radio revenues, and media space.
 
 
 36
 These attributes operate to make each team an entity in large part distinct from the NFL. It is true that cooperation is necessary to produce a football game. However, as the district court concluded, this does not mean, "that each club can produce football games only as an NFL member." 519 F.Supp. at 584. This is especially evident in light of the emergence of the United States Football League.
 
 
 37
 For the foregoing reasons, we affirm the district court's rejection of the NFL's single entity defense.[4] Of course, the singular nature of the NFL will need to be accounted for in discussing the reasonableness of the restriction on team movement, but it is not enough to preclude Sec. 1 scrutiny. The NFL's related argument that Rule 4.3 is valid as a restraint ancillary to a joint venture agreement will be discussed in the rule of reason analysis that follows. Contrary to the NFL's apparent belief, the ancillary restraint doctrine is not independent of the rule of reason. National Society of Professional Engineers v. United States, 435 U.S. 679 at 689, 98 S.Ct. 1355, 1364, 55 L.Ed.2d 637 at 648; see R. Bork, The Rule of Reason and the Per Se Concept: Price Fixing and Market Division, 74 Yale L.J. 775, 796-801 (1965).
 
 B. Rule of Reason
 
 38
 In Chicago Board of Trade v. United States, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683, 687 (1918), Justice Brandeis announced what has become the classic approach used in rule of reason analysis:
 
 
 39
 The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition, or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation, or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.
 
 
 40
 As elaborated upon by this circuit: "Rule of reason analysis calls for a 'thorough investigation of the industry at issue and a balancing of the arrangement's positive and negative effects on competition.' " Cascade Cabinet, 710 F.2d at 1373 (quoting Northrop Corp. v. McDonnell Douglas Corp., 705 F.2d 1030, 1050 (9th Cir.1983)). This balancing process is not applied, however, until after the plaintiff has shown the challenged conduct restrains competition. Cascade Cabinet, 710 F.2d at 1373. To establish a cause of action, plaintiff must prove these elements: "(1) An agreement among two or more persons or distinct business entities; (2) Which is intended to harm or unreasonably restrain competition; (3) And which actually causes injury to competition." Kaplan v. Burroughs Corp., 611 F.2d 286, 290 (9th Cir.1979), cert. denied, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980); accord Reid Brothers Logging Co. v. Ketchikan Pulp Co., 699 F.2d 1292, 1296 (9th Cir.1983).
 
 
 41
 Our rejection of the NFL's single entity defense implicitly recognized the existence of the first element--the 28 member clubs have entered an agreement in the form of the NFL Constitution and Bylaws. As will be developed in more detail, we have no doubt the plaintiffs also met their burden of proving the existence of the second element. Rule 4.3 is on its face an agreement to control, if not prevent, competition among the NFL teams through territorial divisions. The third element is more troublesome. It is in this context that we discuss the NFL's ancillary restraint argument. Also, a showing of injury to competition requires "[p]roof that the defendant's activities had an impact upon competition in a relevant market," Kaplan, 611 F.2d at 291, proof that "is an absolutely essential element of a rule of reason case." Id.; see Aydin Corp. v. Loral Corp., 718 F.2d 897, 901 (9th Cir.1983).
 
 
 42
 Other courts have applied rule of reason analysis to determine the legality of concerted action undertaken by the NFL and for the most part have found such action illegal. E.g., North American Soccer League, 670 F.2d 1249; Smith v. Pro Football, Inc., 593 F.2d 1173 (D.C.Cir.1978); Mackey v. National Football League, 543 F.2d 606 (8th Cir.1976), cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). The instant case is the first of this type in this circuit, however, and the first in which a member club has questioned the legality of NFL rules.
 
 
 43
 In a quite general sense, the case presents the competing considerations of whether a group of businessmen can enforce an agreement with one of their co-contractors to the detriment of that co-contractor's right to do business where he pleases. More specifically, this lawsuit requires us to engage in the difficult task of analyzing the negative and positive effects of a business practice in an industry which does not readily fit into the antitrust context. Section 1 of the Sherman Act was designed to prevent agreements among competitors which eliminate or reduce competition and thereby harm consumers. Yet, as we discussed in the context of the single entity issue, the NFL teams are not true competitors, nor can they be.
 
 
 44
 The NFL's structure has both horizontal and vertical attributes. See, e.g., Continental TV, Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). On the one hand, it can be viewed simply as an organization of 28 competitors, an example of a simple horizontal arrangement. On the other, and to the extent the NFL can be considered an entity separate from the team owners, a vertical relationship is disclosed. In this sense the owners are distributors of the NFL product, each with its own territorial division. In this context it is clear that the owners have a legitimate interest in protecting the integrity of the League itself. Collective action in areas such as League divisions, scheduling and rules must be allowed, as should other activity that aids in producing the most marketable product attainable. Nevertheless, legitimate collective action should not be construed to allow the owners to extract excess profits. In such a situation the owners would be acting as a classic cartel. Agreements among competitors, i.e., cartels, to fix prices or divide market territories are presumed illegal under Sec. 1 because they give competitors the ability to charge unreasonable and arbitrary prices instead of setting prices by virtue of free market forces. See United States v. Trenton Potteries Co., 273 U.S. 392, 397, 47 S.Ct. 377, 379, 71 L.Ed. 700, 705 (1927); United States v. Topco Associates, 405 U.S. at 611, 92 S.Ct. at 1135, 31 L.Ed.2d at 527-528.
 
 
 45
 On its face, Rule 4.3 divides markets among the 28 teams, a practice presumed illegal, but, as we have noted, the unique structure of the NFL precludes application of the per se rule. North American Soccer League, 670 F.2d at 1258-1259; see Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc., 710 F.2d 1366, 1370-1373 (9th Cir.1983). Instead, we must examine Rule 4.3 to determine whether it reasonably serves the legitimate collective concerns of the owners or instead permits them to reap excess profits at the expense of the consuming public.
 
 1. Relevant Market
 
 46
 The NFL contends it is entitled to judgment because plaintiffs failed to prove an adverse impact on competition in a relevant market. The NFL's claim that it is entitled to judgment notwithstanding the verdict is governed by the same standards as a motion for directed verdict, discussed above. The court is not permitted to account for witness credibility, weigh the evidence or reach a different result it finds more reasonable as long as, viewing the evidence in a light most favorable to the nonmoving party, the jury's verdict is supported by substantial evidence. William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014, 1026 (9th Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 58, 74 L.Ed. 61 (1982).
 
 
 47
 The relevant market provides the basis on which to balance competitive harms and benefits of the restraint at issue. See Kaplan, 611 F.2d at 291; see also Lektro-Vend Corp. v. Vendo Co., 660 F.2d 255, 268-269 (7th Cir.1981), cert. denied, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). Such evidence is essential in a section 1 case. See Continental TV, Inc., 433 U.S. at 53 n. 21, 97 S.Ct. at 2559 n. 21, 53 L.Ed.2d at 582, n. 21 ("an antitrust policy divorced from market considerations would lack any objective benchmarks").
 
 
 48
 In the present case, the parties entered a stipulation regarding relevant market evidence because the time allowed for witnesses in the second trial was restricted by the trial court. The stipulation provided that no experts would be called to testify on the subject. Instead, the transcripts and exhibits used by the economic experts were deemed incorporated in the record and admitted in evidence at the retrial, allowing counsel to argue market issues as if the experts had testified before the jury. Our review shows, however, that neither the transcripts nor the exhibits were placed before the jury. We are surprised that in a trial of this magnitude these able attorneys would neglect such important evidence. Upon a careful review of the record, however, we find that testimony of others was sufficient to cover the subject where necessary, and to guide the jury's finding that Rule 4.3 is an unreasonable restraint of trade.
 
 
 49
 In the antitrust context, the relevant market has two components: the product market and the geographic market. Product market definition involves the
 
 
 50
 process of describing those groups of producers which, because of the similarity of their products, have the ability--actual or potential--to take significant amounts of business away from each other. A market definition must look at all relevant sources of supply, either actual rivals or eager potential entrants to the market.
 
 
 51
 Kaplan, 611 F.2d at 292 (quoting SmithKline Corp. v. Eli Lilly & Co., 575 F.2d 1056, 1063 (3d Cir.), cert. denied, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978)). Two related tests are used in arriving at the product market: first, reasonable interchangeability for the same or similar uses; and second, cross-elasticity of demand, an economic term describing the responsiveness of sales of one product to price changes in another. Id. at 291; see 3 J. von Kalinowski, Antitrust Laws and Trade Regulations, Sec. 8.02 (1983). Similar considerations determine the relevant geographic market, which describes the "economically significant" area of effective competition in which the relevant products are traded. Kaplan, 611 F.2d at 292 (quoting Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)).
 
 
 52
 The claims of the Raiders and the L.A. Coliseum, respectively, present somewhat different market considerations. The Raiders attempted to prove the relevant market consists of NFL football (the product market) in the Southern California area (the geographic market). The NFL argues it competes with all forms of entertainment within the United States, not just Southern California. The L.A. Coliseum claims the relevant market is stadia offering their facilities to NFL teams (the product market) in the United States (the geographic market). The NFL agrees with this geographic market, but argues the product market involves cities competing for all forms of stadium entertainment, including NFL football teams.
 
 
 53
 That NFL football has limited substitutes from a consumer standpoint is seen from evidence that the Oakland Coliseum sold out for 10 consecutive years despite having some of the highest ticket prices in the League. A similar conclusion can be drawn from the extraordinary number of television viewers--over 100 million people--that watched the 1982 Super Bowl, the ultimate NFL product. NFL football's importance to the television networks is evidenced by the approximately $2 billion they agreed to pay the League for the right to televise the games from 1982-1986. This contract reflects the networks' anticipation that the high number of television viewers who had watched NFL football in the past would continue to do so in the future.
 
 
 54
 To some extent, the NFL itself narrowly defined the relevant market by emphasizing that NFL football is a unique product which can be produced only through the joint efforts of the 28 teams. Don Shula, coach of the Miami Dolphins, underscored this point when he stated that NFL football has a different set of fans than college football.
 
 
 55
 The evidence from which the jury could have found a narrow pro football product market was balanced, however, with other evidence which tended to show the NFL competes in the first instance with other professional sports, especially those with seasons that overlap with the NFL's. On a broader level, witnesses such as Pete Rozelle and Georgia Frontierre (owner of the L.A. Rams) testified that NFL football competes with other television offerings for network business, as well as other local entertainment for attendance at the games.
 
 
 56
 In terms of the relevant geographic market, witnesses testified, in particular Al Davis, that NFL teams compete with one another off the field for fan support in those areas where teams operate in close proximity such as New York City-New Jersey, Washington, D.C.-Baltimore, and formerly San Francisco-Oakland. Davis, of course, had firsthand knowledge of this when his team was located in Oakland. Also, the San Francisco Forty-Niners and the New York Giants were paid $18 million because of the potential for harm from competing with the Oakland Raiders and the New York Jets, respectively, once those teams joined the NFL as a result of the merger with the American Football League. Al Davis also testified at length regarding the potential for competition for fan support between the Raiders and the Los Angeles Rams once his team relocated in Los Angeles.
 
 
 57
 Testimony also adequately described the parameters of the stadia market. On one level, stadia do compete with one another for the tenancy of NFL teams. Such competition is shown by the Rams' move to Anaheim. Carroll Rosenbloom was offered what he considered to be a more lucrative situation at the Big A Stadium, so he left the L.A. Coliseum. In turn, the L.A. Coliseum sought to lure existing NFL teams to Los Angeles. Competition between the L.A. Coliseum and the Oakland Coliseum for the tenancy of the Raiders resulted.
 
 
 58
 It is true, as the NFL argues, that competition among stadia for the tenancy of professional football teams is presently limited. It is limited, however, because of the operation of Rule 4.3. Prior to this lawsuit, most teams were allowed to relocate only within their home territory. That is why Carroll Rosenbloom could move his team to Anaheim. This is not to say the potential for competition did not previously exist. There was evidence to the effect that the NFL in the past remained expressly noncommitted on the question of team movement. This was done to give owners a bargaining edge when they were renegotiating leases with their respective stadia. The owner could threaten a move if the lease terms were not made more favorable.
 
 
 59
 The NFL claims that it is places, not particular stadia, that compete for NFL teams. This is true to a point because the NFL grants franchises to locales (generally a city and a 75 mile radius extending from its boundary). It is the individual stadia, however, which are most directly impacted by the restrictions on team movement. A stadium is a distinct economic entity and a territory is not.
 
 
 60
 It is also undoubtedly true, as the NFL contends, that stadia attempt to contract with a variety of forms of entertainment for exhibition in their facilities. In the case of the L.A. Coliseum, this includes college football, concerts, motorcycle races and the like. An NFL football team, however, is an especially desirable tenant. The L.A. Coliseum, for example, had received the highest rent from the Rams when they played there. We find that this evidence taken as a whole provided the jury with an adequate basis on which to judge the reasonableness of Rule 4.3 both as it affected competition among NFL teams and among stadia.
 
 
 61
 We conclude with one additional observation. In the context of this case in particular, we believe that market evidence, while important, should not become an end in itself. Here the exceptional nature of the industry makes precise market definition especially difficult. To a large extent the market is determined by how one defines the entity: Is the NFL a single entity or partnership which creates a product that competes with other entertainment products for the consumer (e.g., television and fans) dollar? Or is it 28 individual entities which compete with one another both on and off the field for the support of the consumers of the more narrow football product? Of course, the NFL has attributes of both examples and a variety of evidence was presented on both views. In fact, because of the exceptional structure of the League, it was not necessary for the jury to accept absolutely either the NFL's or the plaintiff's market definitions. Instead, the critical question is whether the jury could have determined that Rule 4.3 reasonably served the NFL's interest in producing and promoting its product, i.e., competing in the entertainment market, or whether Rule 4.3 harmed competition among the 28 teams to such an extent that any benefits to the League as a whole were outweighed. As we find below, there was ample evidence for the jury to reach the latter conclusion.
 
 2. The History and Purpose of Rule 4.3
 
 62
 The NFL has awarded franchises exclusive territories since the 1930's. In the early days of professional football, numerous franchises failed and many changed location in the hope of achieving economic success. League members saw exclusive territories as a means to aid stability, ensuring the owner who was attempting to establish an NFL team in a particular city that another would not move into the same area, potentially ruining them both.
 
 
 63
 Rule 4.3 is the result of that concern. Prior to its amendment in 1978, it required unanimous League approval for a move into another team's home territory. That, of course, gave each owner an exclusive territory and he could vote against a move into his territory solely because he was afraid the competition might reduce his revenue. Notably, however, the League constitution required only three-quarters approval for all other moves. The 1978 amendment removed the double-standard, and currently three-quarters approval is required for all moves.
 
 
 64
 That the purpose of Rule 4.3 was to restrain competition among the 28 teams may seem obvious and it is not surprising the NFL admitted as much at trial. It instead argues that Rule 4.3 serves a variety of legitimate League needs, including ensuring franchise stability. We must keep in mind, however, that the Supreme Court has long rejected the notion that "ruinous competition" can be a defense to a restraint of trade. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 221, 60 S.Ct. 811, 843, 84 L.Ed. 1129, 1167 (1940). Conversely, anticompetitive purpose alone is not enough to condemn Rule 4.3. See Chicago Board of Trade, 246 U.S. at 238, 38 S.Ct. at 244, 62 L.Ed. at 687. The rule must actually harm competition, and that harm must be evaluated in light of the procompetitive benefits the rule might foster. See Kaplan, 611 F.2d at 291.
 
 
 65
 3. Ancillary Restraints and the Reasonableness of Rule 4.3
 
 
 66
 The NFL's primary argument is that it is entitled to judgment notwithstanding the verdict because under the facts and the law, Rule 4.3 is reasonable under the doctrine of ancillary restraints. The NFL's argument is inventive and perhaps it will breathe new life into this little used area of antitrust law, but we reject it for the following reasons.
 
 
 67
 The common-law ancillary restraint doctrine was, in effect, incorporated into Sherman Act section 1 analysis by Justice Taft in United States v. Addyston Pipe & Steel Co., 85 F. 271 (6th Cir.1898), aff'd as modified, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899). R. Bork, The Rule of Reason, supra at 799-800. Most often discussed in the area of covenants not to compete, the doctrine teaches that some agreements which restrain competition may be valid if they are "subordinate and collateral to another legitimate transaction and necessary to make that transaction effective." Id. at 797-798; see Addyston Pipe, 85 F. at 281-82; Lektro-Vend, 660 F.2d at 265.
 
 
 68
 Generally, the effect of a finding of ancillarity is to "remove the per se label from restraints otherwise falling within that category." R. Bork, Ancillary Restraints and the Sherman Act, 15 Antitrust L.J. 211, 212 (1959). We assume, with no reason to doubt, that the agreement creating the NFL is valid and the territorial divisions therein are ancillary to its main purpose of producing NFL football. The ancillary restraint must then be tested under the rule of reason, id., the relevance of ancillarity being it "increases the probability that the restraint will be found reasonable." Aydin Corp. v. Loral Corp., 718 F.2d 897, 901 (9th Cir.1983). As we have already noted, the rule of reason inquiry requires us to consider the harms and benefits to competition caused by the restraint and whether the putative benefits can be achieved by less restrictive means.
 
 
 69
 The competitive harms of Rule 4.3 are plain. Exclusive territories insulate each team from competition within the NFL market, in essence allowing them to set monopoly prices to the detriment of the consuming public. The rule also effectively foreclosed free competition among stadia such as the Los Angeles Coliseum that wish to secure NFL tenants. See Smith v. Pro Football, Inc., 593 F.2d at 1185. The harm from Rule 4.3 is especially acute in this case because it prevents a move by a team into another existing team's market. If the transfer is upheld, direct competition between the Rams and Raiders would presumably ensue to the benefit of all who consume the NFL product in the Los Angeles area.
 
 
 70
 The NFL argues, however, that territorial allocations are inherent in an agreement among joint venturers to produce a product. This inherent nature, the NFL asserts, flows from the need to protect each joint venturer in the "legitimate fruits of the contract, or to protect him from the dangers of an unjust use of those fruits by the other party." Addyston Pipe & Steel, 85 F. at 282. We agree that the nature of NFL football requires some territorial restrictions in order both to encourage participation in the venture and to secure each venturer the legitimate fruits of that participation.
 
 
 71
 Rule 4.3 aids the League, the NFL claims, in determining its overall geographical scope, regional balance and coverage of major and minor markets. Exclusive territories aid new franchises in achieving financial stability, which protects the large initial investment an owner must make to start up a football team. Stability arguably helps ensure no one team has an undue advantage on the field. Territories foster fan loyalty which in turn promotes traditional rivalries between teams, each contributing to attendance at games and television viewing.
 
 
 72
 Joint marketing decisions are surely legitimate because of the importance of television. Title 15, U.S.C. Sec. 1291 grants the NFL an exemption from antitrust liability, if any, that might arise out of its collective negotiation of television rights with the networks. To effectuate this right, the League must be allowed to have some control over the placement of teams to ensure NFL football is popular in a diverse group of markets.
 
 
 73
 Last, there is some legitimacy to the NFL's argument that it has an interest in preventing transfers from areas before local governments, which have made a substantial investment in stadia and other facilities, can recover their expenditures. In such a situation, local confidence in the NFL is eroded, possibly resulting in a decline in interest. All these factors considered, we nevertheless are not persuaded the jury should have concluded that Rule 4.3 is a reasonable restraint of trade. The same goals can be achieved in a variety of ways which are less harmful to competition.
 
 
 74
 As noted by Justice Rehnquist, a factor in determining the reasonableness of an ancillary restraint is the "possibility of less restrictive alternatives" which could serve the same purpose. See Justice Rehnquist's dissent from the denial of certiorari in North American Soccer League --- U.S. ----, ----, 103 S.Ct. 499, 502, 74 L.Ed.2d 639, 641 (1982); Lektro-Vend, 660 F.2d at 265. This is a pertinent factor in all rule of reason cases. See Betaseed, Inc. v. U & I Inc., 681 F.2d 1203, 1228-30 (9th Cir.1982); Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 303 (2d Cir.1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). Here, the district court correctly instructed the jury to take into account the existence of less restrictive alternatives when determining the reasonableness of Rule 4.3's territorial restraint. 32 T.R.2d at 7218; see Betaseed, Inc., 681 F.2d 1203 at 1228; Berkey Photo, 603 F.2d at 303. Because there was substantial evidence going to the existence of such alternatives, we find that the jury could have reasonably concluded that the NFL should have designed its "ancillary restraint" in a manner that served its needs but did not so foreclose competition.
 
 
 75
 The NFL argues that the requirement of Rule 4.3 that three-quarters of the owners approve a franchise move is reasonable because it deters unwise team transfers. While the rule does indeed protect an owner's investment in a football franchise, no standards or durational limits are incorporated into the voting requirement to make sure that concern is satisfied. Nor are factors such as fan loyalty and team rivalries necessarily considered.
 
 
 76
 The NFL claims that its marketing and other objectives are indirectly accounted for in the voting process because the team owners vote to maximize their profits. Since the owners are guided by the desire to increase profits, they will necessarily make reasonable decisions, the NFL asserts, on such issues of whether the new location can support two teams, whether marketing needs will be adversely affected, etc. Under the present Rule 4.3, however, an owner need muster only seven friendly votes to prevent three-quarters approval for the sole reason of preventing another team from entering its market, regardless of whether the market could sustain two franchises. A basic premise of the Sherman Act is that regulation of private profit is best left to the marketplace rather than private agreement. See United States v. Trenton Potteries, 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927). The present case is in fact a good example of how the market itself will deter unwise moves, since a team will not lightly give up an established base of support to confront another team in its home market.
 
 
 77
 The NFL's professed interest in ensuring that cities and other local governments secure a return on their investment in stadia is undercut in two ways. First, the local governments ought to be able to protect their investment through the leases they negotiate with the teams for the use of their stadia. Second, the NFL's interest on this point may not be as important as it would have us believe because the League has in the past allowed teams to threaten a transfer to another location in order to give the team leverage in lease negotiations.
 
 
 78
 Finally, the NFL made no showing that the transfer of the Raiders to Los Angeles would have any harmful effect on the League. Los Angeles is a market large enough for the successful operation of two teams, there would be no scheduling difficulties, facilities at the L.A. Coliseum are more than adequate, and no loss of future television revenue was foreseen. Also, the NFL offered no evidence that its interest in maintaining regional balance would be adversely affected by a move of a northern California team to southern California.
 
 
 79
 It is true, as the NFL claims, that the antitrust laws are primarily concerned with the promotion of interbrand competition. Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 51, 97 S.Ct. 2549, 2558, 53 L.Ed.2d 568, 581, n. 19 (1977). To the extent the NFL is a product which competes with other forms of entertainment, including other sports, its rules governing territorial division can be said to promote interbrand competition. Under this analysis, the territorial allocations most directly suppress intrabrand, that is, NFL team versus NFL team, competition. A more direct impact on intrabrand competition does not mean, however, the restraint is reasonable. The finder of fact must still balance the gain to interbrand competition against the loss of intrabrand competition. See id., at 51-56, 97 S.Ct. at 2558-2560. Here, the jury could have found that the rules restricting team movement do not sufficiently promote interbrand competition to justify the negative impact on intrabrand competition.
 
 
 80
 To withstand antitrust scrutiny, restrictions on team movement should be more closely tailored to serve the needs inherent in producing the NFL "product" and competing with other forms of entertainment. An express recognition and consideration of those objective factors espoused by the NFL as important, such as population, economic projections, facilities, regional balance, etc., would be well advised. See L. Kurlantzick, Thoughts on Professional Sports and the Antitrust Laws, 15 Conn.L.R. 183, 206 (1983). Fan loyalty and location continuity could also be considered. Id. at 206-207. Al Davis in fact testified that in 1978 he proposed that the League adopt a set of objective guidelines to govern team relocation rather than continuing to utilize a subjective voting procedure.
 
 
 81
 Some sort of procedural mechanism to ensure consideration of all the above factors may also be necessary, including an opportunity for the team proposing the move to present its case. Id.; see Silver v. New York Stock Exchange 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) (without procedural safeguards, the collective act of the Exchange in disconnecting the wire service to a broker constituted a boycott, per se illegal under Sec. 1); cf. Deesen v. Professional Golfers Ass'n, 358 F.2d 165 (9th Cir.), cert. denied, 385 U.S. 846, 87 S.Ct. 72, 17 L.Ed.2d 76 (1966) (where PGA had reasonable rules governing eligibility of players for tournaments, there was not a Sec. 1 violation). In the present case, for example, testimony indicated that some owners, as well as Commissioner Rozelle, dislike Al Davis and consider him a maverick. Their vote against the Raiders' move could have been motivated by animosity rather than business judgment.
 
 
 82
 Substantial evidence existed for the jury to find the restraint imposed by Rule 4.3 was not reasonably necessary to the production and sale of the NFL product. Therefore, the NFL is not entitled to judgment notwithstanding the verdict.
 
 III. JURY INSTRUCTIONS
 
 83
 The NFL also claims it is entitled to a new trial because of error in the jury instructions. In particular, the NFL argues that the instructions lacked the specificity required in a complex lawsuit such as this, that certain of its legal theories should have been presented to the jury, and that the instructions failed to articulate all the requirements of the law for finding an unlawful restraint of trade. The L.A. Coliseum and the Raiders respond by stating that the instructions as given were entirely adequate and the NFL simply attempted to have the jury charged with a partisan and erroneous view of the law.
 
 
 84
 As required by Fed.R.Civ.P. 51, the NFL submitted proposed instructions and made timely objections when certain of its proposals were rejected. The question, then, is whether, viewing the jury instructions as a whole, the trial judge gave adequate instructions on each element of the case to insure that the jury fully understood the issues. Ragsdell v. Southern Pacific Transportation Co., 688 F.2d 1281, 1282 (9th Cir.1982); Van Cleef v. Aeroflex Corp., 657 F.2d 1094, 1099 (9th Cir.1981). A court is not required to use the exact words proposed by a party, incorporate every proposition of law suggested by counsel or amplify an instruction if the instructions as given allowed the jury to determine intelligently the issues presented. Id; Investment Service Co. v. Allied Equities Corp., 519 F.2d 508, 511 (9th Cir.1975). Well-tailored and specific instructions may be necessary, however, in complex antitrust cases "where ... abstract legal principles are not self-explanatory to a lay jury, and the facts to which they must be applied are complex." Lessig v. Tidewater Oil Co., 327 F.2d 459, 466 n. 13 (9th Cir.), cert. denied, 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). Also, a party is entitled to have theories supported by the evidence presented to the jury. Reno-West Coast Distribution Co., Inc. v. Mead Corp., 613 F.2d 722, 725-726 (9th Cir.), cert. denied, 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 183 (1979). The theory, of course, must have legal as well as factual support; if what is proposed is incorrect the court is not required to recast it in order to ensure the party's exact theory is before the jury, so long as the instructions describe the applicable law. See id.
 
 
 85
 The NFL first contends the instructions failed to emphasize the unique nature of the business of producing NFL football, a business, it argues, most aptly characterized as a joint venture. The trial court's rule of reason instruction, however, told the jury it should consider the "nature of" and "facts peculiar to" the industry and that "one factor you may consider is the degree of mutual cooperation inherent among the member clubs of a professional sports league and the extent to which professional sports leagues differ from ordinary kinds of businesses." 32 T.R.2d at 7216-7218. While not framed in the terms and detail requested by the NFL, this instruction did apprise the jury of the unique nature of NFL football. The trial court was not obliged to specifically instruct the jury on the NFL's theory that the restraint involved here is ancillary to a valid joint venture agreement. The Supreme Court has recognized that the "Rule of Reason ... has been regarded as a standard for testing the enforceability of covenants in restraint of trade which are ancillary to a legitimate transaction." National Society of Professional Engineers v. United States, 435 U.S. 679, 689, 98 S.Ct. 1355, 1364, 55 L.Ed.2d 637, 648 (1978). The NFL's theory is subsumed within the rule of reason. As the district court emphasized, the NFL had every opportunity to present its view of the legality of Rule 4.3 to the jury. 32 T.R.2d at 7195, 7223. The NFL did just that in its closing argument. E.g., 33 T.R.2d at 7491-7495.
 
 
 86
 The NFL next argues the district court improperly rejected its instruction on causation. It is true the court did not instruct the jury on this element of proving when an injured party is entitled to treble damages under Sec. 4 of the Clayton Act. See Brunswick v. Pueblo Bowl-O-Mat, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701, 712 (1977); see also Kapp v. National Football League, 586 F.2d 644, 648 (9th Cir.1978), cert. denied, 441 U.S. 907, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979). In this bifurcated trial, however, the jury and the court were not faced with the question of the propriety of an award of damages, but with the question whether Rule 4.3 violated the antitrust laws and therefore could not be used to preclude the Raiders' move south. Pueblo Bowl-O-Mat, 429 U.S. at 491, 97 S.Ct. at 698, 50 L.Ed.2d at 713. Whether the jury received proper instructions in this area is best left for the appeal of the damage portion of the trial.
 
 
 87
 The NFL also argues it was unduly prejudiced by the instructions because they focused on issues of competition among the NFL teams (intrabrand competition) rather than competition between the NFL "product" and other forms of entertainment (interbrand competition). As the NFL asserts, it is the suppression of interbrand competition that primarily concerns the antitrust laws. The trial court instructed the jury on the NFL's relevant market claim that it competes with all forms of entertainment. 32 T.R.2d at 7212-7215. In light of this instruction, the jury was not constrained to ascertain the reasonableness of Rule 4.3 solely in view of the internal NFL market.
 
 
 88
 There also was no error in the failure of the district court to charge the jury that it could balance the loss of competition in the San Francisco Bay Area against that to be gained in the Los Angeles area. The extent of the loss and gain to competition in these locations was a fact question that could be argued to the jury.
 
 
 89
 The NFL next argues that the trial court should have charged the jury that it could consider the procompetitive significance of public service and similar benefits, if any, that inure to Rule 4.3. We again find no error. As stated in National Society of Professional Engineers:
 
 
 90
 the purpose of [either per se or rule of reason] analysis is to form a judgment about the competitive significance of the restraint; it is not to decide whether a policy favoring competition is in the public interest, or in the interest of the members of the industry. Subject to exceptions defined by statute, that policy decision has been made by the Congress.
 
 
 91
 435 U.S. at 692, 98 S.Ct. at 1365, 55 L.Ed.2d at 650. The judge instructed the jury that it should consider only procompetitive benefits of Rule 4.3. 32 T.R.2d at 7216. The NFL was permitted to argue that Rule 4.3 has procompetitive effects related to serving the public. No more is necessary.
 
 
 92
 The NFL's other assignments of error in the instructions are without merit. In sum, we are not persuaded that any lack of specificity misled the jury.
 
 IV. VENUE
 
 93
 Oakland Coliseum, intervenor joined by the NFL, argues that the trial court abused its discretion by denying a change of venue motion made pursuant to 28 U.S.C. Sec. 1404(a). In relevant portion, Sec. 1404(a) allows a district court to change venue "in the interest of justice." Oakland Coliseum claims justice would have best been served by moving the case because it was impossible to secure an impartial jury in the Central District of California due to pretrial publicity and the economic interest of the prospective jurors in the outcome of the lawsuit. Prior to voir dire, the district court made a thoughtful and thorough analysis of Oakland's contentions in its memorandum and order denying the change of venue motion. 89 F.R.D. 497 (1981).
 
 
 94
 We will find an abuse of discretion warranting reversal only if Oakland Coliseum shows "that the setting of the trial was inherently prejudicial or that the jury selection process permits an inference of actual prejudice." Murphy v. Florida, 421 U.S. 794, 803, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589, 597 (1975); see Smith v. Phillips, 455 U.S. 209, 215-217, 102 S.Ct. 940, 944-945, 71 L.Ed.2d 78, 85-86 (1982); Chandler v. Florida, 449 U.S. 560, 581-582, 101 S.Ct. 802, 813, 66 L.Ed.2d 740, 756 (1981); United States v. Bailleaux, 685 F.2d 1105, 1109 (9th Cir.1982); United States v. Brown, 540 F.2d 364, 379 (8th Cir.1976). Neither the pretrial publicity nor the alleged financial interest of the jurors compels such a finding.
 
 
 95
 We assume, with some basis, that the Raiders' proposed move and this lawsuit generated a large amount of publicity in the Los Angeles area. That in itself, however, is insufficient to compel a finding that the defendants were denied an impartial jury. Dobbert v. Florida, 432 U.S. 282, 302-303, 97 S.Ct. 2290, 3202-3203, 53 L.Ed.2d 344, 361-362 (1977); Murphy v. Florida, 421 U.S. at 800-802, 95 S.Ct. at 2036-2037, 44 L.Ed.2d at 595-596. Only in those situations which are "utterly corrupted by press coverage" will we indulge in a presumption of actual prejudice on the part of any or all of the jurors. Murphy, 421 U.S. at 798, 95 S.Ct. at 2035, 44 L.Ed.2d at 594. No such showing has been made out here. The trial court used a very thorough voir dire process to ensure the jury panel members were not influenced by the publicity prior to trial, including administering a 48-page questionnaire prepared by the NFL to all prospective jurors, giving each side ten peremptory challenges instead of the normal three, and dismissing jurors for cause if even the slightest doubt of prejudice was raised. During the trial, the court admonished the jurors each day to refrain from exposure to any type of media coverage of the trial. In fact, one juror was excused because he admitted reading an unscreened newspaper, even though he adamantly denied reading anything but the Ann Landers column, the comics and the "Family Weekly" section. 23 T.R.2d at 4705-4706, 4920. In view of the trial court's thorough cautionary actions, we cannot say either that he abused his discretion in denying a change of venue or that defendants received an unfair trial because of the publicity.
 
 
 96
 Failing to show anything beyond the slightest speculation that publicity infected the fairness of the trial, Oakland Coliseum turns to the argument that the jurors had a financial interest in the outcome of the lawsuit which biased their decision. This contention is premised on the economic interest through lower taxes and business generation that residents of the Central District of California purportedly would have in the Raiders' presence in the L.A. Coliseum. The argument also seeks support in Supreme Court precedent such as Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), and Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927), which stand for the proposition "that the probability of actual bias on the part of the judge or decisionmaker is too high ... [when] the adjudicator has a pecuniary interest in the outcome." Withrow, 421 U.S. at 47, 95 S.Ct. at 1464, 43 L.Ed.2d at 723. Those cases do not mean, however, that an immeasurable and seemingly insignificant economic benefit to a taxpayer suffices to disqualify her or him as a juror. Virginia Electric & Power Co. v. Sun Shipbuilding & Dry Dock Co., 389 F.Supp. 568, 571 (E.D.Va.1975); cf. United States v. Brown, 540 F.2d 364, 379 (8th Cir.1976) (there was no basis to strike jurors for cause merely on showing they resided in St. Louis and indictment alleged a scheme to defraud the city and its citizens).
 
 
 97
 Here, in fact, four of the eight jurors resided outside Los Angeles County. All the jurors were questioned during voir dire on their potential for any financially motivated bias and the judge was satisfied with the jurors' responses to his questions. Apparently recognizing the defects in its arguments, Oakland also alleges that the questioning and arguments of plaintiffs' counsel at trial were sufficient to convince the jurors to lay aside their sworn duties and decide the case on the basis of "hometown" interests. We decline to engage in such speculation about the mental processes of the individual jurors.
 
 
 98
 The other arguments made by Oakland on this issue, such as the one claiming it was denied a representative jury because the jury had no football fans, lack merit. Parties are not entitled to jurors of a particular bent or persuasion. They are entitled only to jurors as fair and impartial as all human circumstances and an evenhanded selection process permits. Nor do we believe the "cumulative" effect of the publicity, economic interests and the like show a sufficient likelihood of actual bias. Without more, we are compelled to affirm the denial of the change of venue motion and conclude that the defendants received a fair trial by an impartial jury.
 
 V. CONCLUSION
 
 99
 The NFL is an unique business organization to which it is difficult to apply antitrust rules which were developed in the context of arrangements between actual competitors. This does not mean that the trial court and jury were incapable of meeting the task, however. The lower court correctly applied and described the law. The reasonableness of a restraint is a "paradigm fact question," Betaseed, Inc. v. U and I Inc., 681 F.2d 1203, 1228 (9th Cir.1982), and our review of the record convinces us the jury had adequate evidence to answer that question.
 
 
 100
 We believe antitrust principles are sufficiently flexible to account for the NFL's structure. To the extent the NFL finds the law inadequate, it must look to Congress for relief.
 
 
 101
 The judgment finding the NFL liable to the Los Angeles Coliseum and the Raiders, and enjoining the NFL from preventing the Raiders from relocating in Los Angeles is
 
 
 102
 AFFIRMED.
 
 
 103
 SPENCER WILLIAMS, District Judge, Sitting by Designation, concurring in part, dissenting in part.
 
 INTRODUCTION:
 
 104
 I respectfully dissent from the majority's opinion, insofar as it affirms the district judge's directed verdict that the N.F.L. was not a single entity as a matter of law.
 
 
 105
 The dispositive issue before this Court is whether the N.F.L.'s invocation of Rule 4.3 to block the Raiders' move to Los Angeles violates the letter and spirit of Sec. 1 of the Sherman Act, 15 U.S.C. Sec. 1. I conclude that the N.F.L. is, as a matter of law, a single entity insofar as this aspect of its operations is concerned, and not subject to the strictures of Sherman Act Sec. 1.
 
 
 106
 These appeals arise from the controversial relocation of the Raiders National Football League franchise ("Raiders") from Oakland, California to Los Angeles, California. Although many subsidiary procedural issues are posed on appeal, the case stands or falls on whether the trial judge properly concluded that the N.F.L. was not a "single entity", thereby exposing it to liability for Rule 4.3 under the Sherman Act, Sec. 1.
 
 FACTS:
 
 107
 Our consideration of the issue whether or not Rule 4.3 of Article IV of the N.F.L. Constitution violates federal antitrust laws must turn on the relationship of Rule 4.3 to the structure of the league. For this reason, it is appropriate to briefly examine the history and nature of the N.F.L. as a business association, before addressing the issues raised on this appeal.
 
 
 108
 A. The Relevant History of the N.F.L.
 
 
 109
 The N.F.L. was established early in this century as an unincorporated business association, the members of which were member franchise clubs dispersed throughout the United States. All but one of its members are privately owned and operated, and although members of the N.F.L. compete on the playing field, they act jointly in many aspects of their enterprise, as the term "league" implies.
 
 
 110
 The N.F.L.'s Constitution and By-Laws wield almost plenary control over member clubs' activities; the N.F.L. acts as the legislative entity which sets rules for, and schedules contests between member clubs, and regulates many other aspects of the operation of the professional football industry, (e.g., an annual draft of eligible college athletes), including the territorial restriction on franchise relocation found in Rule 4.3.
 
 
 111
 Of particular importance to our analysis is the fact that the N.F.L. Constitution provides for coordination of business activities and revenue sharing to an overwhelming degree. For example, the money derived from lucrative national broadcasting contracts is shared among league members according to agreed upon formulae, and this revenue makes up a large part of the revenue of each team. As to gate receipts for regularly scheduled contests between member clubs, there is a prearranged equation splitting gate admissions between the "home" and "visiting" clubs. Thus, each team relies, to a significant degree, on revenue jointly generated.[1] It is not surprising that, concomitant with this virtual "partnership" arrangement, of which the above-mentioned revenue sharing is most significant, other operating decisions which would normally be made by the owners of a single franchise are subordinated to specified consent of the other clubs. For example, establishment of a new franchise is submitted for approval to all N.F.L. owners before any expansion is permitted. Agreements among owners regarding who shall have the right to employ certain athletes occur every year at an annual "draft" of available players.
 
 
 112
 At issue here is one aspect of the relationship among the member clubs of the N.F.L. as to when a member franchise club may be relocated to a city other than its original home. It is quite relevant to disposition of this instant suit that those challenging the legality of Rule 4.3 are the Raiders, presently a member club, and the L.A. Coliseum, a stadium seeking an N.F.L. tenant.
 
 
 113
 B. The History of the Present Action.
 
 
 114
 I agree in large part with the majority's review of the facts leading up to the two trials below. However, I would emphasize the troubling effect that the stipulation on the presentation of evidence in the second trial had upon the sufficiency of the evidence on relevant markets that was actually placed before the jury.[2]
 
 
 115
 C. The Various Appeals Pending before this Court.
 
 
 116
 In addition to the appeal to which the majority and I turn our primary attention, several other motions are pending before this Court. It is these items, and the questions that these cross-appeals raise, that I now address.
 
 
 117
 Once in this Court, the parties have continued to file multiple, and somewhat conflicting, appeals. The motions that have not been resolved by the majority are largely different procedural means to accomplish the same ends; I discuss the more significant below.
 
 
 118
 First, the N.F.L. has moved this Court for permission to supplement the record on the question of the effect of the stipulation entered into by the parties concerning the evidence introduced at the second trial on the relevant market. I find the majority's treatment of this matter interesting, inasmuch as it suggests that the issue of relevant market is no longer one for the jury; we admit to similar surprise that the very evidence that the parties thought at a minimum should have been placed before the jury was, in fact, never so placed in the second trial. Regardless of how the majority wishes to restate the manner in which relevant market is to be proven in this Circuit, its approach is to recharacterize the case as was tried, and suggest by inference that the plaintiff may discharge its burden of establishing the relevant product and geographic markets by a theoretical argument to the court, rather than by presenting evidence to a jury; this lynchpin of its "rule of reasonableness" cannot pass as innocuously by long-standing precedent as the majority would have it. Since I feel that it was error to submit Rule 4.3 to the jury in this context, I would not so strain the case as was tried the second time around to conform it to some new, and as yet undefined, rule of law.
 
 
 119
 Second, the Raiders cross-appeal from the district judge's rulings: (1) determining, on summary judgment, that N.F.L. Rule 4.3 was effectively amended on October 5, 1978; (2) that, as a matter of law, no contract was created between the Raiders and the N.F.L., on October 5, 1978; and, (3) that a directed verdict on behalf of Rozelle, Frontiere and Klein was appropriate, would presumably be withdrawn, under the majority's disposition; I would affirm the trial court's handling of all three matters.
 
 
 120
 Finally, as for the N.F.L.'s motion for remand of the injunctive judgment entered on June 14, 1982, with instructions to the court for a new trial, I find the matters raised by the motion in the alternative to the N.F.L.'s notice of appeal, especially the allegations surrounding the plaintiffs' suppression of a key document, the "Hardy notes," distressing. I note that the majority's opinion does not deal with this issue.
 
 DISCUSSION:
 
 121
 The district court found there were no disputed issues of material fact on the question of whether the N.F.L. was a single entity under the Sherman Act Sec. 1, insofar as its enforcement of Rule 4.3 was concerned, and directed a verdict for appellees concluding that it was not. Upon this finding, Rule 4.3 was submitted to the jury's scrutiny under the Rule of Reason analysis of the Sherman Act, Sec. 1.
 
 
 122
 Under established Ninth Circuit law, resolution of whether the N.F.L. had the capacity to violate Section 1 of the Sherman Act by conspiring inter se must be committed to the jury, if there exists "sufficient evidence in the record to permit a jury to find" that the N.F.L. was not a single entity, but "not ... sufficient (evidence) to preclude the jury from finding otherwise." Murray v. Toyota Motor Distributors, Inc., 664 F.2d 1377, 1379 (9th Cir.1982) (per curiam).
 
 
 123
 In Murray v. Toyota Motor Distributors, Inc., supra, the Ninth Circuit held that the "single entity" question must not be taken from the jury where the evidence would permit a finding that the defendants are part of a single economic unit. As the majority in this case states: "(i)t would be reversible error, then, to take the issue from the jury if reasonable minds could differ as to its resolution". Id. I read the majority's opinion to find such an opportunity for "reasonable minds" to differ, even if the evidence that whether "the N.F.L. has attributes of a partnership or joint venture (wa)s not "compelling", since it should have been submitted to the jury once there was simply "persuasive" evidence on either side. C.f., Majority Opinion at 1387.
 
 
 124
 I agree however with the district court that there were no material issues of disputed fact as to whether the N.F.L. was a single entity, and that the matter was ripe for disposition as a matter of law by the court. I also apply the settled rule of appellate review, that such decisions by the trial court are subject to de novo review by this Court. C.f., General Business Systems v. North American Phillips Corp., 699 F.2d 965, 980-81 (9th Cir.1983). But, the majority and I differ substantially in the conclusions to be drawn from such undisputed evidence.
 
 
 125
 The only realistic manner in which to define what constitutes a single entity for antitrust review is to focus upon the purpose the definition is to serve. "Single entity" taken in a functional sense begins and ends with an analysis of formal organizational and operational aspects of an enterprise, reconciled with the realities of the economic competition in the marketplace. If the aim of the Sherman Act Sec. 1 is consumer-dictated supply, unfettered by conspiracy between competing producers,--and, I submit that it is--extreme caution is warranted in defining precisely what competitive units exist in the marketplace. It is equally as important to permit collaboration and concerted action among branches of a single economic entity in the marketplace with impunity from the Sherman Act Sec. 1, as it is to police conspiracies between economic competitive entities. Nonetheless, all economic units remain susceptible to challenge under the antitrust laws from those external entities injured by acts violative of Sec. 1, or competitive entities injured as result of monopoly, or attempted monopoly, in an industry under Sherman Act Sec. 2 tenets.
 
 
 126
 Resolving whether the N.F.L. is a single entity requires consideration of many factors, including formalistic aspects of operations such as ownership, overlapping directorates, joint marketing or manufacturing, legal identity, corporate law autonomy, and substantive aspects such as de facto autonomy of member clubs, chains of command over policy decisions, public perception and economic interdependency rendering otherwise independent member clubs subordinate to the integrated whole. When the entities in question are to be evaluated under the antitrust laws, the crucial criterion is whether the formally distinct member clubs compete in any economically meaningful sense in the marketplace. See General Business Systems, supra at 980-81.
 
 
 127
 The majority's attempt to reconcile its decision with that of General Business Systems, supra, is misleading and inaccurate. The text of the majority's opinion implies that corporate policies must be unitary for a business organization to be found a single entity. In General Business Systems, supra, at 980-81, the Circuit concluded that in any case in which the relationship between the two or more formal entities did "not fall clearly at either of these extremes"; i.e., "where corporate policies are set by one individual or a parent corporation" or where "jointly owned corporations that compete in the marketplace, hold themselves out to the public as competing organizations, and set policy independently ..." (id. at 980), the case must be sent to the jury. This admonition was disregarded in this case--a paradigm case testing the functional "single entity" concept.
 
 
 128
 The district court placed an unwarranted emphasis upon the formalistic aspects of the relationship of the N.F.L. and the member clubs, ignoring the subtle, but yet more significant interdependency of the member clubs and the indivisibility of the clubs with the N.F.L. 519 F.Supp. 581, 582-83. For example, the district court makes much of two such formal organizational characteristics: separate incorporation and management. Id. But, when viewed from the mundane perspective of daily operations, emphasis upon these legal formalisms obscures the reality of life in the N.F.L. Only the athletic strategems are autonomous--albeit tightly constrained by league guidelines on eligibility, medical and physical condition and exploitation of player talent. The N.F.L. cannot truly be separated from its member clubs, which are simultaneously franchisees and franchisors. The Raiders did not, and do not now, seek to compete with the other clubs in any sense other than in their win/loss standings; they do not challenge the plethora of other ancillary regulations attendant to the league structure, including the draft, regulation and scheduling of meetings between teams, and the system of pooled and shared revenues among the clubs because they wish to remain within its beneficial ambit.
 
 
 129
 As the majority opinion correctly points out:
 
 
 130
 this lawsuit requires us to engage in the difficult task of analyzing the negative and positive effects of a business practice in an industry which does not readily fit into the antitrust context. Section 1 of the Sherman Act was designed to prevent agreements among competitors which eliminate or reduce competition and thereby harm consumers. Yet, ..., the N.F.L. teams are not true competitors, nor can they be.
 
 
 131
 Majority opinion, at 1391, emphasis added. Yet, the majority's analysis falters in a similar manner. It is the commonality of, or necessary cooperation in, the means of production, not the formal structure of the ownership of the N.F.L. infrastructure which should be determinative of the classification of this enterprise.
 
 
 132
 The profound interdependency of the N.F.L. and member clubs in the daily operation and strategic marketing of professional football belies the district court's conclusion that each member club is an individual and economically meaningful competitor. The dispositive factor in determining whether the member clubs are capable of conspiring to restrain competition--the sine qua non of the Sherman Act Sec. 1--by reason of Rule 4.3, is the extent, if any, of their competition in an economic sense. Virtually every court to consider this question has concluded that N.F.L. member clubs do not compete with each other in the economic sense. See North American Soccer League v. N.F.L., 670 F.2d 1249, 1251 (2d Cir.1982); Smith v. Pro Football, Inc., 593 F.2d 1173, 1179 (D.C.Cir.1978); Mackey v. N.F.L., 543 F.2d 606, 619 (8th Cir.1976); Mid-South Grizzlies v. N.F.L., 550 F.Supp. 558, 562 (E.D.Pa.1982); U.S. v. N.F.L., 116 F.Supp. 319, 323-324 (E.D.Pa.1953).
 
 
 133
 As the district court in Mid-South Grizzlies acknowledged, although
 
 
 134
 (a)ll but one team are privately owned and operated ... and 'compete' with one another on the playing field and for the top players, they act jointly in many aspects of their enterprise as the term league necessarily implies.
 
 
 135
 Mid-South Grizzlies, supra at 562. In adopting this view to reject a potential entrant's challenge to his exclusion from N.F.L. participation, the court in Mid-South Grizzlies recognized that the creation of many joint products, only the most tangible of which is the professional football season, as byproducts of the intangible "goodwill" are directly attributable to the present league/member club structure. Id. at 568. I agree with the other courts which, when presented with similar questions arising in professional hockey and basketball, realized that it is nonsensical to emphasize intrinsic worth of a franchise in a vacuum, when the value of the franchises are part and parcel of the quality and conformity insured by league regulation of the placement, ownership, and coordination of all on and off the field interaction of member clubs. See San Francisco Seals, Ltd. v. National Hockey League, 379 F.Supp. 966, 969-971 (C.D.Cal.1974) (the N.H.L., although subject to full scope of the antitrust laws, is "one single business enterprise, competing against other similarly organized professional leagues"); Levin v. National Basketball Association, 385 F.Supp. 149, 150, 152 (S.D.N.Y.1974) ("While it is true that the antitrust laws apply to a professional athletic league, and that joint action by members of a league can have antitrust implications this is not such a case.").
 
 
 136
 The majority's holding places the Ninth Circuit's ruling in conflict with every other circuit to consider this issue. As the majority points out, but misapplies, the Second Circuit found the N.F.L. to be an "unincorporated joint venture". N.A.S.L. v. N.F.L., supra at 1257, (2d Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982). The Fifth Circuit, in an obscure but quite scholarly opinion, analyzed the North American Soccer League to be like the N.F.L.; i.e., a "joint employer" for labor relations purposes, upon an examination of its "N.F.L.-like" characteristics. N.A.S.L. v. N.L.R.B., 613 F.2d 1379, 1382 (5th Cir.1980). The Third Circuit, after reviewing the substantial history of "single entity" litigation in the professional sports leagues, endorsed the D.C. Circuit's conclusion that the N.F.L. was a "single entity" for purposes of Sherman Act Sec. 1, and thus not subject to "invocation of a per se rule" against "group boycotts", because: (1) "the N.F.L. clubs that had combined were not competitors in any economic sense" and "no team was 'interested in driving another team out of business'; and, (2) the N.F.L. clubs had not combined 'to exclude competitors or potential competitors from their level of the market.' Larry V. Muko, Inc. v. Southwestern P.A., etc., 670 F.2d 421, 429, n. 11 (3d Cir.1982), citing Smith v. Pro Football, Inc., 593 F.2d 1173, 1178 (D.C.Cir.1978). (emphasis in original ). (Other citations omitted).
 
 
 137
 What these courts have all recognized, and what ultimately persuades me, is that functionally distinct units that cannot produce separate, individual goods or services absent coordination are inextricably bound in an economic sense, and must adopt certain intra-league instrumentalities to regulate the whole's "downstream output". In the case of the member clubs, this "downstream output" is professional football, and the organ of regulation is the unincorporated, not-for-profit, association commonly known as the N.F.L. There is virtually no practical distinction between the League, administered by the appointed Commissioner, per se and the member clubs; the N.F.L. represents to all clubs, including the Raiders, the least-costly and most efficient manner of reaching day-to-day decisions regarding the production of their main, and collectively produced product.
 
 
 138
 Although the N.F.L. determines matters of scheduling, resolving player disciplinary matters and inter-club disputes, supervising officials and public relations, as well as other routine matters, critical league decisions, such as the matter of franchise location, are submitted to an Executive Committee comprised of a representative of each club. There can be no instance of the Executive Committee acting in other than the collective interests of the member clubs, since by definition, that body's decisions are the consensus of N.F.L. members. There is no distinct interest of the N.F.L., since it exists solely to coordinate the members' participation in the joint production of professional football.
 
 
 139
 By riveting its attention upon the "single entity" issue, as a sort of talismanic affirmative defense to the appellees' charges here, the district court overlooked the dispositive inquiry of whether Rule 4.3, as an instrument of the N.F.L. member clubs, violated the Sherman Act Sec. 1, by restricting any economically independent entities from supplying goods or services related to professional football to the individual clubs. I use "upstream flow" as shorthand for products and services like players and coaches, television services, potential investors and the myriad of other integrated industries; member clubs do have independent and economically significant identities apart from the collective N.F.L. for the limited purposes of their extra-league dealings with those upstream suppliers. See Weistart & Lowell, Law of Sports, Sec. 5.11 (1978), 687, 692 esp. n. 86. Thus, Sec. 1 can and should protect the competitive aspects of player drafts, disallow cross-ownership bans and exclusive television and equipment contracts, by insuring that any one club's interaction outside the confines of intra-league regulation of production of the sport is unfettered by the working of any intraleague rule.
 
 
 140
 This is the critical distinction between cases which invalidate various intraleague rules, and those which uphold them. That member clubs compete for investors and the services of talented players is underscored by the fact that, although aggregate revenues are shared among all member clubs, there is no intra-league regulation upon the form of investment by a member club's financial backers, the dividend policy, or operating expenses and expenditures of any member for player services. League regulations comport with economic reality in this sense; courts have merely applied a similar philosophy to other aspects of the professional leagues' operations, including, inter alia, club-player relationships. See, e.g., Smith, supra (N.F.L. player draft held to violate Sec. 1, even though N.F.L. teams not "economic" competitors, because it "forces each seller of football services to deal with one, and only one buyer, robbing the seller, as in any monopsonistic market, of any real bargaining power."); Mackey, supra, (only relevant market in which to evaluate "Rozelle Rule" was that "for players' services"); Denver Rockets v. All-Pro Management, Inc., 325 F.Supp. 1049, 1061 (C.D.Cal.1971) (harm resulting from restriction on non-collegiate players' recruiting was these players' exclusion from market in which they sought to compete by reason of the monopoly power exerted by the N.B.A.); accord, Linseman v. World Hockey Association, 439 F.Supp. 1315, 1322 (D.Conn.1977); Kapp v. National Football League, 390 F.Supp. 73, 81-82 (N.D.Cal.1974), appeal vacated, 586 F.2d 644 (9th Cir.1978), cert. denied, 441 U.S. 907, 99 S.Ct. 1996, 60 L.Ed.2d 375 (1979) ("(a) conceivable effect of th(e "ransom" or "Rozelle" rule) would be to perpetually restrain a player from pursuing his occupation among the clubs of a league that holds a virtual monopoly of professional football employment in the United States", which "goes far beyond any possible need for fair protection ... and imposes upon the player-employers or the purposes of the N.F.L. such undue hardship as to be an unreasonable restraint ...."); cf., North American Soccer League, et al. v. N.F.L., et al., supra, (N.F.L. ban on cross-ownership of professional football and soccer league clubs violative of Sherman Act Sec. 1).
 
 
 141
 The paradox to which I return, as the root of why the N.F.L., as well as other sports leagues, must be regarded as a "single entity" is that the keener the on-field competition becomes, the more successful their off-the-field, and ultimately legally relevant, collaboration. The formal entities, including the member clubs--including the Raiders--which the district court ruled to be competitors cannot compete, because the only product or service which is in their separate interests to produce can only result as a fruit of their joint efforts. This systemic cooperation trickles down to all members of the league, regardless of their on-the-field record, at least to the extent of the shared revenues. As at least one district court has previously recognized, despite some limited independently earned profit from "team paraphernalia" and "local broadcast revenues",
 
 
 142
 (a) franchise's popularity is inextricably bound up with the quality of its competition on the playing field and the resulting excitement and sense of team loyalty.
 
 
 143
 Mid-South Grizzlies, supra, at 568. The ability to accrue separately accounted and disbursed profit, of which the district court made much, "is an indirect benefit of being a member of the league". Id.
 
 
 144
 A ruling that the N.F.L. cannot enforce Rule 4.3 is effectively ruling that it may not enforce any collective decision of its member clubs over the dissent of a club member, although this is precisely what each owner has contractually bargained for in joining the enterprise. Without power to reach collective decisions, the N.F.L. structure becomes superfluous, and professional sports, without a cost-effective policing mechanism such as the league, will dissolve in the face of uncontrollable free-riding and loss of economies of scale. Broadcast Music, Inc. v. Columbia Broadcast System, Inc., 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979).
 
 
 145
 Not only did the district court underrate the business scenario in which the member teams cooperate far more than they compete in the legally irrelevant on-field sense, but its directed verdict on the single entity issue ignored two significant aspects of the N.F.L.'s organization. First, the N.F.L. member clubs pool their revenues to a degree unique even among sporting leagues. By focusing upon the separate calculation of profits and loss by members, the district court elevated form over substance. Profit, as currently understood in the accounting profession, is a term of art, and as such is inherently subjective, often manipulated by equity interests to serve legally irrelevant business motives. The relevant consideration, as the N.F.L. has recognized by implementation of its shared revenue concept, is total infusion of consumer dollars into the sport, and some predictable and centrally administered allocation of those jointly earned revenues among member clubs. After that purpose, the members adopt the only workable model for earning and distributing the revenues from sale of a non-severable and indistinct product--professional football. See generally, Quirk, An Economic Analysis of Team Movements in Professional Sports, 38 Law & Contemporary Problems 42 (1973).
 
 
 146
 The product distributed by the member clubs is not analogous to ball bearings (Timken Roller Bearing Co. v. U.S., 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951)), mattresses (U.S. v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967)), or groceries (U.S. v. Topco Associates, 405 U.S. 596, 598, 92 S.Ct. 1126, 1128, 31 L.Ed.2d 515 (1972)), because stripped of the N.F.L. rules, participation in a regulated draft, orderly schedules and league standings, professional football is indistinguishable from sand lot follies. This inescapable fact of interdependence distinguishes the N.F.L. franchisees and professional football from other industries comprised of "separate business entities whose products have independent value" (519 F.Supp. at 584) banded together in de facto cartels. C.f., Broadcast Music Inc., supra; Associated Press et al. v. United States, 326 U.S. 1, 18, 65 S.Ct. 1416, 1423, 89 L.Ed. 2013 (1945) (Douglas, J., in concurring, notes that it is unclear whether the AP system would violate Sherman Act Sec. 1).
 
 
 147
 There was no evidence before the district court establishing that a member club of the N.F.L. could, or would seek to, defect to the U.S.F.L., thereby transferring its assets in quest of greater exploitation. Only such a showing, or an alternative theory, supported by evidence in the record could illustrate that any particular member club had an intrinsic value shorn of its affiliation with the N.F.L., and thus could support the district court's result. We find no such evidence in the record. C.f. Associated Press, supra (newspapers which sought to affiliate did not share revenues, and each produced separate and distinct products with intrinsic value). There is no evidence that any of the member clubs' investors would have committed time or capital investment without the existing league structure. Without the league, professional football becomes a pursuit no more substantial than a group of finely-tuned athletes traveling haphazardly about, in search of playing competition. Accord, Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).
 
 
 148
 Not only is it legally irrelevant that a second professional league has sprung up, since the U.S.F.L. did not exist at the time of trial, but since the two leagues' schedules do not overlap, one should not hypothesize as to any competitive relationship between the two, or the effect such inter-league competition would portend for the validity of intra-league regulation. Thus, while I find issues of supposed competitive relations between the N.F.L. and U.S.F.L., or between existing and any new franchisees, intellectually interesting, I also dismiss any legal conclusions based upon these entities as speculative.
 
 
 149
 Holding that the N.F.L. is not a single entity, but rather an aggregation of economic competitors, is tantamount to ruling that the N.F.L. structure is itself per se invalid under the Sherman Act Sec. 1; this will spell the end of sporting leagues as are currently used in football, hockey, golf, soccer, basketball and countless other associations in industries with similar endemic characteristics. See Board of Regents of the University of Oklahoma v. N.C.A.A., 707 F.2d 1147 (10th Cir.1983) cert. granted, --- U.S. ----, 104 S.Ct. 272, 78 L.Ed.2d 253 (1983).
 
 
 150
 To elevate formal corporate characteristics of ongoing economic entities above the substance of what purpose and function the structure serves, and what product(s) emerge from the process would not only destroy the N.F.L., professional sports leagues, and the goodwill that results from continuity in national allocation of the sport throughout the country, but would create a rule of law casting all franchise/wholesale distribution relationships into inescapable doubt.
 
 
 151
 Rather than avoid creating an "exemption" from the Sherman Act for professional sporting leagues, failing to account for the substantial and unique characteristics extant in professional sports by refusing the N.F.L. review as a single entity creates turmoil and dissolves the analytic framework within which courts scrutinize agreements under Sherman Act Sec. 1. It is unrealistic and inaccurate to lump intra-N.F.L. rules in with agreements binding separate economic entities which produce independent products and accrue independent revenues. See Mid-South Grizzlies, supra; Levin, supra. Rule 4.3 is no more a restraint on trade in professional football for Sherman Act Sec. 1 purposes, than is an intracorporate directive regulating the location or operation of its headquarters, franchise, or branch of a multi-outlet business. See, e.g., Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).
 
 
 152
 No "antitrust exemption" for the N.F.L. would be created by holding that it is a single economic entity for purposes of regulating franchise location. Section 2 of the Sherman Act, prohibiting monopolies and attempts to monopolize, remains fully applicable to all N.F.L. intra-league rules and activities. See Mid-South Grizzlies, supra; c.f., Bowman v. N.F.L., 402 F.Supp. 754 (D.Minn.1975) (challenge brought by former W.F.L. players to N.F.L. teams as an illegal boycott and unjustified exercise of monopoly power); Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc., 351 F.Supp. 462 (E.D.Pa.1972) (Sherman Act Sec. 2 applied to bar hockey reserve clause).
 
 
 153
 Many present N.F.L. practices, including Rule 4.3, are highly suspect under the Sherman Act Sec. 2 prohibitions, because notwithstanding the form or substance of the N.F.L.'s style of organization and operation, some practices appear calculated to create barriers to entry for would-be rival leagues in profitable geographical markets. In short, Sherman Act Sec. 2 is the proper curb upon the N.F.L.'s successful exploitation of its intra-firm economies of scale and competitive advantages. Radovich v. N.F.L., 352 U.S. 445, 453-54, 77 S.Ct. 390, 394-95, 1 L.Ed.2d 456 (1957) and particularly American Football League v. N.F.L., 323 F.2d 124, 131 (4th Cir.1963) suggest the possibility of true economic competitors challenging the effect of intra-league rules upon nascent competition under Sec. 2 of the Sherman Act.
 
 
 154
 The Raiders do not have standing to challenge Rule 4.3 under Sec. 2; as part and parcel of the entity they knowingly joined in 1967, they may have a cause of action in contract against the rest of the N.F.L. for failure of their expectations arising from their membership, but cannot challenge intra-league regulations, as could would-be "upstream" suppliers or hopeful candidates for franchises like the Mid-South Grizzlies or the San Francisco Seals. See San Francisco Seals v. National Hockey League, 379 F.Supp. 966, 971-72 (C.D.Cal.1974). The Coliseum may be able to mount a successful challenge to Rule 4.3 upon a Sec. 2 theory, but that issue is not presently before this Court.
 
 
 155
 As always, Sec. 1 remains a viable theory under which those "upstream" aspects of member clubs' operations--those activities which the N.F.L. and previous courts acknowledge the individual members as economically distinct entities--could be challenged. An oft-tried, and frequently successful example of this theory has been the player draft litigation; the distinction between instances in which the N.F.L. acts as a collective monitor of intra-league affairs, and those in which it intercedes at the behest of a member club for anti-competitive advantage over "upstream" bargaining entities outside the N.F.L.
 
 
 156
 The purposes for which the N.F.L. should be viewed as a single entity, impervious to Sec. 1 attack, must be functionally defined as those instances in which member clubs must coordinate intra-league policy and practice if the joint product is to result. See, Broadcast Music Inc., supra; GTE Sylvania, supra. Prohibiting the N.F.L. from attempting to exploit a monopolistic position in the industry, or from cloaking concerted anti-competitive pressure upon extrinsic "upstream" suppliers in the guise of "league" restrictions, does not require that we strike ancillary terms of the franchise agreements between member clubs as anti-competitive. A principled approach requires that we distinguish one situation from the other, and protect both competitive markets for football players and television coverage, as well as the integrity of terms Al Davis agreed to as salient aspects of his arms' length negotiations with the other member clubs. Davis has received no more or less than he has bargained for, as a franchisee of the N.F.L.
 
 
 157
 To hold the N.F.L. a single entity for purposes of intra-league regulation of relocation of existing franchises, thereby cutting off Sherman Act Sec. 1 liability in this instance, is fully consistent with the prior cases that address the validity of league regulation of member clubs. In such cases, the leagues' power has consistently been upheld. See, e.g., A.F.L. v. N.F.L., supra; Mid-South Grizzlies, supra; San Francisco Seals, supra; and Levin, supra.
 
 
 158
 I concur in the majority's opinion, insofar as it affirms the trial judge's denial of the appellants' motion for a change in venue. However, I would note the inappropriateness of applying the substantial body of case law dealing with racial bias in criminal venire to an instance where the strongest objections to the venue revolved around a highly attentuated financial or civic interest bestowed upon the jury by its deliberations concluding in favor of the L.A. Coliseum and Raiders. I would commend the trial judge for his extraordinary care in screening out prospective jurors who showed even a hint of bias, in maintaining an orderly proceeding despite the high degree of press coverage and histrionic advocacy by the parties, and in assuring deliberations in an informed and unemotive manner. As a result of his painstaking care, I find that the appellants received the verdict of six fair and untainted jurors.
 
 CONCLUSION:
 
 159
 Because the district court incorrectly determined that the N.F.L. member clubs are not engaged in a single enterprise for purposes of determining the location and marketing of professional football games between members, the jury verdict on the lawfulness of Rule 4.3 must not stand. Rule 4.3 cannot, as a matter of law, violate Sec. 1 of the Sherman Act. The judgment of the district court should be reversed and judgment entered for the N.F.L. and its codefendants.
 
 
 
 *
 The Honorable Spencer M. Williams, United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 Rule 4.3 originally read:
 Any transfer of an existing franchise to a location within the home territory of any other club shall only be effective if approved by a unanimous vote; any other transfer shall only be effective if approved by the affirmative vote of not less than three-fourths or 20, whichever is greater, of the member clubs of the League.
 After its 1978 amendment, Rule 4.3 states:
 The League shall have exclusive control of the exhibition of football games by member clubs within the home territory of each member. No member club shall have the right to transfer its franchise or playing site to a different city, either within or outside its home territory, without prior approval by the affirmative vote of three-fourths of the existing member clubs of the League.
 
 
 [2]
 Once in this court, the parties have continued their practice of affirmative lawyering and have filed multiple motions. The motions that have not been resolved up until this point are here discussed
 First, the NFL has moved this court for permission to supplement the record on the question of the effect of the stipulation entered into by the parties concerning relevant market. We grant the motion and will discuss the effect of the stipulation with the merits section, infra.
 Second, the Raiders agreed to drop its cross-appeal if the judgment of antitrust liability and injunction is affirmed. As we are affirming that judgment, we dismiss the Raiders' cross-appeals, Nos. 82-5665 and 83-5938. It is unnecessary to address the NFL's and Oakland Coliseum's motions on this subject.
 Finally, the Raiders have moved to dismiss the NFL's and Oakland Coliseum's appeals from the district court's denial of their Fed.R.Civ.P. 60(b) motions. This motion is granted. The district court lacked jurisdiction to consider this motion; its denial of the motion is not an appealable order. Smith v. Lujan, 588 F.2d 1304, 1307 (9th Cir.1979). Also, the district court indicated no desire to entertain the motions if this court remanded this case back to it. Id. The appeals in Nos. 83-5714 and 83-5732 are dismissed.
 
 
 [3]
 On remand in Broadcast Music the Second Circuit did not conclude, as the NFL claims, that rule of reason analysis was unnecessary. It found only that it was unnecessary to balance the pro and anticompetitive effects of the blanket licensing arrangement because no anticompetitive effects were proven. Columbia Broadcasting System, Inc. v. American Society of Composers, 620 F.2d 930, 934-935 (2d Cir.1980), cert. denied, 450 U.S. 970, 101 S.Ct. 1491, 67 L.Ed.2d 621 (1981). As will be discussed below, that reasoning squares with this circuit's view that a showing of anticompetitive effect is a threshold rule of reason consideration. See Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc., 710 F.2d 1366, 1373 (9th Cir.1983)
 
 
 [4]
 One district court case has reached the opposite conclusion in a somewhat similar context. In San Francisco Seals, Ltd. v. National Hockey League, 379 F.Supp. 966 (C.D.Cal.1974), the court upheld the NHL's right to preclude the Seals' proposed move to Vancouver. The court found both that the NHL is a single entity incapable of conspiring in violation of Sec. 1 of the Sherman Act and that the denial of the move had no anticompetitive effect. A recent law review article argues that the court in Seals correctly decided the single entity issue. M. Grauer, Recognition of the National Football League as a Single Entity under Section 1 of the Sherman Act: Implications of the Consumer Welfare Model, 82 Mich.L.Rev. 1 (1983). Although Seals and this article offer persuasive reasons for recognizing the NFL as a single entity, we do not find these reasons so compelling that existing precedent can be ignored or that we should grant this association of 28 independent businesses blanket immunity from attack under Sec. 1 of the Sherman Act. The unitary nature of the NFL can be accounted for by analyzing the competitive harms and benefits of Rule 4.3 under the rule of reason, without impinging on Congress' authority to decide whether a specific industry deserves an exemption from the antitrust laws. See Jefferson County Pharmaceuticals v. Abbott Laboratories, --- U.S. ----, ---- - ----, 103 S.Ct. 1011, 1016-17, 74 L.Ed.2d 882, 890-91 (1983); see also United States v. Cooper Corp., 312 U.S. 600, 606, 61 S.Ct. 742, 744, 85 L.Ed. 1071, 61 S.Ct. 742 (1941)
 
 
 [1]
 Indeed, no team could generate any revenue without drawing down upon the goodwill and reputation of the N.F.L. in the largest sense, or upon the status of any one scheduled opponent in an immediate sense, so that, in effect, all team revenue is jointly produced
 
 
 [2]
 See Majority Opinion at 1392 - 1394, and my discussion infra of the inconsistency left unanswered by the majority's treatment