Counsel will prepare an appropriate judgment incorporating by reference these Findings of Fact and Conclusions of Law for entry by the Court within twenty (20) days.

**MAYOR AND CITY COUNCIL OF BALTIMORE, a municipal corporation**

v.

**BALTIMORE FOOTBALL CLUB INC., a body corporate of the State of Delaware, and National Football League, an Unincorporated Association.**

**INDIANAPOLIS COLTS, INC.**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE, a municipal corporation, William Donald Schaefer, Mayor of City of Baltimore, John Doe, Richard Roe, ABC, Inc., and XYZ, a partnership.**

Civ. A. Nos. B–84–1294, B–84–2560.

United States District Court,
D. Maryland.

Dec. 9, 1985.

As Amended Jan. 8, 1986.

on the Colts' motion to dismiss or in the alternative for summary judgment.

Benjamin L. Brown, Baltimore City Sol., Ambrose T. Hartman, Deputy City Sol., Richard K. Jacobsen, Chief Sol., L. William Gawlik, and J. Shawn Alcarese, Asst. City Solicitors; and Edwin C. Thomas, III, John R. Myers, Dennis P.W. Johnson, and Bell, Boyd & Lloyd, Chicago, Ill., for Mayor and City Council of Baltimore, William Donald Schaefer, Mayor of the City of Baltimore, and members of the Baltimore City Council.

Joshua R. Treem and Schulman & Treem, P.A., Baltimore, Md., and Max O. Truitt, Jr., James Robertson, James E. Coleman, Jr., Carol E. Mattey and Gay Gellhorn, Wilmer, Cutler & Pickering, Washington, D.C., for Baltimore Football Club, Inc./Indianapolis Colts, Inc.

George Beall, Mark D. Gately, and Miles & Stockbridge, Baltimore, Md., and Paul J. Tagliabue, Sonya D. Winner, and Covington & Burling, Washington, D.C., for Nat. Football League, an unincorporated ass'n, and Nat. Football League, a joint venture of its member teams.

## MEMORANDUM OPINION

WALTER E. BLACK, JR., District Judge.

The original action (B–84–1294) in this consolidated litigation involves the attempt of the Mayor and City Council of Baltimore ("the City") to condemn a professional football team—formerly the Baltimore Colts, and now doing business as the Indianapolis Colts ("the Colts"). Through its power of eminent domain, the City seeks to condemn the Colts' franchise in the National Football League ("NFL"), arguing that it was within the City's power of eminent domain on March 30, 1984, the date of the filing of the condemnation suit in state court. The Colts assert that "the Colts are gone" from Maryland, that the franchise was outside of the state of Maryland at whatever time is appropriate for determining its location. The matter is now pending before the court

## I. BACKGROUND

In late 1983 and early 1984, Robert Irsay, the owner of the Colts, was considering relocation of the team. Extensive negotiations between Irsay and Mayor William Donald Schaefer of Baltimore and Governor Harry R. Hughes of Maryland had not produced agreement over the terms of a lease for Memorial Stadium or other matters which Irsay thought important to the Colts' continuation in Baltimore.

On February 1, 1984, the City of Indianapolis solicited the Colts' consideration of the Hoosier Dome in Indianapolis as a possible site for the playing of the Colts' home games. Michael Chernoff, vice-president and general counsel of the Colts, responded by visiting Indianapolis and the Hoosier Dome and expressed an interest in the possibility of relocation. Accordingly, Indianapolis Mayor William H. Hudnut, III set up a "control group" of local politicians and businessmen to negotiate with the Colts' organization in the hope of persuading them to relocate.

On February 24, 1984, a bill was introduced in the Maryland Senate authorizing Baltimore to condemn professional sports franchises. No vote was taken on the bill until over a month later. However, the Indianapolis control group was apparently aware of the legislation by late February. During mid-February, serious negotiations began between the Colts and the Capital Improvements Board of Managers of Marion County, Indiana ("CIB"), the owner of the Hoosier Dome, concerning the possibility of a lease of the Dome to the Colts.

On February 28, 1984, the United States Court of Appeals for the Ninth Circuit rendered its opinion in *Los Angeles Memorial Coliseum Commission v. National Football League,* 726 F.2d 1381 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984). In that case, the owner of the Raiders franchise had moved the club from its designated home territory in

Oakland, California to Los Angeles without seeking approval of the NFL. When the NFL voted not to permit the move, the owner filed an antitrust suit, alleging that the League sought to prevent his club from entering and competing in the same home territory as another franchise. The Ninth Circuit affirmed a lower court ruling that the NFL's vote had violated the antitrust laws.

Three days later, on March 2, 1984, the NFL held a special meeting in Chicago to review the Raiders antitrust decision and to discuss its possible impact on other issues before the League. In a privileged executive session, with Irsay and other Colt personnel absent, the League decided that it would take no action with respect to any possible move of the Colts. In light of the Ninth Circuit's recent decision, the League decided that the consideration of a Colts' move would not be a League matter. *See* Minutes of the Privileged Executive Session of the Special Meeting of the National Football League, March 2, 1984. Colts' Motion to Dismiss or for Summary Judgment ("Colts' Motion"), App. 10 at 2.

Later in the March 2 meeting, Irsay was allowed to return and stated that he was considering relocation of the team to Indianapolis, but was still negotiating with both Indianapolis and Baltimore officials. *See* Deposition of Alvin Ray Rozelle, Colts Motion, App. 9 at 43–44. The League expressed neither approval nor disapproval of the possible move. NFL Commissioner Pete Rozelle testified that, "the effect [of this League position] was that Bob Irsay could move the Colts ... to whatever city he chose," without interference from the NFL. *See* Rozelle Deposition, *supra*, at 46.

During the remainder of March, 1984, the Colts continued to negotiate the lease with the CIB and a financing agreement with the Merchants National Bank & Trust Company of Indianapolis. At the same time, discussions continued between the City and the Colts concerning a financial package to be offered by the City in order to keep the Colts in Baltimore. On the

morning of March 28, 1984, Irsay learned, from a Chicago newspaper account, that on March 27, the Maryland Senate had passed emergency legislation which authorized the City to condemn the Colts' NFL franchise and related properties. Irsay immediately decided to move the Colts franchise to Indianapolis. He instructed Chernoff to conclude the Hoosier Dome lease and the loan transaction with Merchants National Bank. In addition, he instructed Chernoff·to move all the Colts' property from Owings Mills, Maryland, to Indianapolis immediately.

Chernoff and the Indianapolis officials executed a twenty-year lease and the corresponding loan agreement the same day. That evening, Chernoff flew to Baltimore with an agent of Aero-Mayflower Transit Co. to coordinate the move. Mayflower personnel worked through the night of March 28–29 at the Colts' Maryland training complex, loading most of the team's physical possessions—including both office and athletic equipment—onto moving vans. By the morning of March 29, 1984, the Mayflower vans were on their way to Indianapolis.

On March 29, Irsay advised Commissioner Rozelle that he had relocated the Colts franchise to Indianapolis as of the close of business March 28, 1984. Later that day, the City served a letter upon the Colts at the team's corporate headquarters in Skokie, Illinois, offering to purchase the team for $40 million. The offer, which terminated as of noon the next day, was not accepted.

On Friday, March 30, the Maryland legislature enacted Emergency Bill No. 1042, 1984 Md. Laws Ch. 6, the legislation which authorized Baltimore City to condemn sports franchises. Shortly thereafter, the Mayor and City Council of Baltimore enacted Emergency Ordinance No. 32, which also authorized such a condemnation. Under the authority of these two pieces of legislation, the City immediately filed a condemnation petition in the Circuit Court for Baltimore City, seeking to acquire the Colts by eminent domain and to enjoin the Colts from doing anything to further the

transfer of the franchise. The Circuit Court issued an injunction, purporting to prohibit the Colts from relocating outside Maryland.

On March 31, 1984, the CIB approved the Colts' new 20-year lease of the Hoosier Dome. On April 5, 1984, the Colts obtained a license to do business in Indiana. On the same day, the Colts filed an interpleader action in the United States Federal District Court for the Southern District of Indiana, seeking to enjoin the condemnation proceedings in the Circuit Court for Baltimore City. Ultimately, the Indianapolis action was dismissed. *See Indianapolis Colts v. Mayor and City Council of Baltimore,* 741 F.2d 954 (7th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1753, 84 L.Ed.2d 817 (1985). Since that time, the Colts have terminated all remaining ties they had with Maryland. For example, on May 11, 1984, the Colts notified the City that they were terminating the Memorial Stadium lease, and on September 17, 1984, the Colts closed their checking accounts in Maryland.

On April 2, 1984, the Colts removed the original condemnation action to this Court on the basis of diversity jurisdiction. The City promptly filed a motion to remand, which was denied. In its opinion of June 22, 1984, this Court determined that for purposes of diversity jurisdiction, the Colts' principal place of business as of March 30, 1984 was "not in Maryland." Colts' Motion, App. 4. The Court is now called upon to conduct a similar inquiry in determining whether the Colts were within the state of Maryland—and within the reach of the condemnation power of Baltimore City—at the appropriate time.

The Colts have moved to dismiss or, in the alternative, for summary judgment. The Court notes that the Colts raise only the threshold issue of the power of Balti-

more City to condemn the franchise, expressly leaving open other defenses, such as the constitutionality of the enabling legislation. Memorandum of Indianapolis Colts ("Colts' Brief") at 4–5 & n.3. Since both parties have submitted significant documentation, affidavits and deposition testimony beyond the pleadings, the Court will treat the Colts' motion as a motion for summary judgment. *See* Rule 12(c) of the Federal Rules of Civil Procedure.

Under Rule 56 of the Federal Rules, a motion for summary judgment can only be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). The burden is on the moving party to demonstrate clearly that there is no genuine issue of fact and any doubt as to the existence of such an issue is resolved against him. *Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.,* 381 F.2d 245, 249 (4th Cir.1967). This burden can be a heavy one; the standard for passing on motions for summary judgment is strict. *Clarke v. Montgomery Ward & Co.,*[1] 298 F.2d 346, 348 (4th Cir. 1962). If interpretations of the facts of a case differ, summary judgment is improper. *Morrison v. Nissan Motor Co., Ltd.,* 601 F.2d 139, 141 (4th Cir.1979). *See also Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985), where the court determined that summary judgment is proper only when "it is 'perfectly clear that there are no [factual] issues in the case.'"

The heart of the Colts' argument is that the team is "gone" from Maryland (Colts' Brief at 2), and that the City lacks the power to assert its power of eminent do-

---

**1.** Citing Charbonnages de France v. Smith, 597 F.2d 406 (4th Cir.1979), the City urges the Court to consider all the possible "inferences" from its version of the facts. Memorandum of the Mayor and City Council of Baltimore ("City's Brief") at 52. "Where ... the non-moving party would on trial carry the burden of proof, he is ... entitled ... to have ... the most favorable of possible alternative inferences from [the evi-

dence] drawn in his behalf ...". Charbonnages, 597 F.2d at 414. This passage restates the familiar rule that the Court at this stage of the proceedings should consider the facts in the light most favorable to the non-moving party. However, it does not require that the Court reach the same legal conclusions as the non-moving party. The word "inference" can hardly be read so broadly.

main over a franchise that is beyond the jurisdiction of the state of Maryland. The City counters by arguing that the Colts' lingering contacts with Maryland are enough to give the City the power to condemn, that the Colts were still operating in Maryland on March 30, 1984, and that substantial disputes of fact exist that would preclude summary judgment. The issues have been fully briefed and the court has had the benefit of oral argument. For the reasons set forth below, the Court has determined that the Colts' motion for summary judgment should be granted.

## II. SITUS

The Colts contend that condemnation may not proceed against property not located within the state of Maryland and that the Colts' franchise was outside of Maryland at the appropriate time for determining its situs. The City argues in response that the team maintained sufficient contacts with Maryland at the time of the March 30 filing for the City to assert its power of eminent domain. In effect, the City argues that the franchise was still in Maryland for purposes of eminent domain.

There are three issues which the Court will address in this inquiry as to where the franchise was located. First, what is the relevant date to determine the location of the Club: the date of the filing of the condemnation proceedings (as the City proffers) or the date when compensation is paid (as the Colts proffer)? Second, what standard is the appropriate test for determining the situs of an intangible franchise in condemnation proceedings? Third, was the franchise in Maryland at the time when situs must be determined?

■ As a preliminary matter, the Court points out that it is now beyond dispute that intangible property is properly the subject of condemnation proceedings. 1 *Nichols on Eminent Domain* (3d ed. 1980), § 2.1[2], pp. 2–8 to 2–9; *Kimball Laundry Co. v. United States*, 338 U.S. 1, 11–13, 69 S.Ct. 1434, 1440–41, 93 L.Ed.

1765 (1949); *City of Oakland v. Oakland Raiders*, 32 Cal.3d 60, 183 Cal.Rptr. 673, 677–78, 646 P.2d 835, 839 (1982). Indeed, the parties do not disagree on this point. Nor is there any dispute over the location of the team's tangible property at the times in question. The issue before us is where was the franchise—the intangible property—at the appropriate time for determining its location?

### A. *The Applicable Date*

The Colts argue that Maryland law requires that property subject to condemnation proceedings must be located within the state of Maryland at the time of judgment. The Colts rely on Article III, § 40, of the Maryland Constitution which provides: "The General Assembly shall enact no Law authorizing private property, to be taken for public use, without just compensation, ... being first paid or tendered to the party entitled to such compensation." Thus, the Colts argue, "property is not taken, and title does not vest, until plaintiff pays the judgment and costs." Colts' Brief at 25, citing Md. Real Prop.Code Ann. §§ 12–102(2), 12–108 (1981).

The City asserts that March 30, 1984, the date of filing of the condemnation petition, is the appropriate date for determining the situs of the franchise. Relying on an Illinois case, *City of Crystal Lake v. LaSalle National Bank*, 121 Ill.App.3d 346, 76 Ill. Dec. 728, 731, 459 N.E.2d 643, 646 (1984), and a California case, *San Bernardino Valley Municipal Water District v. Gage Canal Co.*, 226 Cal.App.2d 206, 37 Cal. Rptr. 856, 859 (1964), the City argues that its rights and interests date from the time of the filing of the condemnation petition, and not from the date of judgment. Memorandum of the Mayor and City Council of Baltimore ("City's Brief") at 44. The City urges the Court to adopt the "relation back" doctrine, even in light of its earlier concession that "the property sought ... cannot be taken, nor can rights over the property be exercised by [the City], until the case is adjudicated."[2] City's Memoran-

---

**2.** At oral argument, counsel for the City also

proffered that the doctrine of *lis pendens* pro-

dum in Support of Motion to Dismiss and/or for Summary Judgment in B–84–2560 at 12.

The Colts respond by arguing that the Maryland case of *Washington Suburban Sanitary Commission v. Nash,* 284 Md. 376, 396 A.2d 538 (1979), makes clear that in Maryland, a condemning authority cannot interfere with an owner's right to use and dispose of his property until it had paid for the property. Colts' Brief at 26. In *Nash,* the Washington Suburban Sanitary Commission (WSSC) negotiated with the owner of a tract of land to acquire the land and standing timber. When they failed to agree upon terms, the owner contracted instead to sell timber on the land to a lumber company. WSSC then filed a petition to condemn the land and shortly thereafter sought an *ex parte* restraining order to prevent removal of the timber. WSSC represented that it needed an injunction in order to preserve the property pending the outcome of the condemnation trial. The Court of Appeals of Maryland held that the injunction was unlawful. It noted that both the Constitution and the statutes of Maryland provide that property cannot be taken by condemnation until the plaintiff has paid for it, stating that WSSC's "mere filing of the condemnation petition gave it no rights in the land. Nash was still free to use the land, enjoy it or dispose of it as before." *Id.* at 381, 396 A.2d 538.

█ Recognizing fully that the precedents cited by both sides do not address the issue of *intangible* property, the Court is nonetheless persuaded that the Colts' view must prevail on this issue. It seems untenable to the Court that the mere filing of a piece of paper in a court—with no compensation being paid—can restrict the owner's use of the property. The statutory scheme provided by the Maryland legislature provides a clear framework of the procedures

for acquiring property through eminent domain. The general rule is that until the condemning authority pays compensation, no right to possession is obtained. *King v. State Roads Commission,* 298 Md. 80, 84, 467 A.2d 1032, 1034 (1983). The logical corollary to this rule is that until such right of possession is obtained by the condemning authority, the owner is free to move and otherwise dispose of the property. *See Nash,* 284 Md. at 381, 396 A.2d 538.

There are, of course, certain procedures whereby the condemning authority need not wait until the end of litigation to assert control over the property. In "quick-take" procedures, for example, the state may take private property immediately "on making the required payment." Md. Real Prop.Code Ann. § 12–101 (1981). *See also King v. State Roads Commission,* 298 Md. at 85–86, 467 A.2d 1032 ("In quick-take cases, the condemning authority takes possession of the property prior to trial upon payment into court of its estimate of the value of the property taken."). In *Nash,* the condemning authority's failure to use quick-take procedures enabled the owner to continue to sell off the timber on his property. *Id.,* 284 Md. at 380–81, 396 A.2d 538. Indeed, the Court in *Nash* found unacceptable the notion that the mere filing of papers for injunctive relief *without payment of compensation* could restrict Nash's use of the land.

In certain other circumstances, the Maryland legislature has allowed a state authority to assert control over property it seeks to condemn by means of an *ex parte* injunction. *See, e.g.,* Md.Nat.Res.Code Ann. § 5–208 (1983) (permitting the Department of Natural Resources to prevent landowners from disposing of materials such as gravel and timber prior to finality of judgment). In the absence of some similar statutory provision, the City has no alterna-

---

vides further support for the City's argument that March 30, 1984 is the appropriate date for determining the situs of the franchise. Counsel cited no authority, nor is the Court aware of any, that compels us to apply that doctrine here. *Lis pendens* is a form of notice to the community that there is a dispute as to title to land and

that those who deal with the property do so at their peril. It has little, if anything, to do with the location of the property at a given time. Indeed, since the doctrine applies uniquely to suits regarding land, one might question whether it has any bearing on the issue here, the situs of an intangible.

tive but to rely on the normal rules of eminent domain as the statutory scheme provides. That framework makes it clear that there is no taking until compensation is paid to the owner or to a court. The City has at no time made any payment of the compensation that would be required, and, as a result, it had no power to stop Irsay from treating his property as he wished.

It is, of course, axiomatic that a sovereign state's power to condemn property extends only as far as its borders and that the property to be taken must be within the state's jurisdictional boundaries. 1 *Nichols on Eminent Domain, supra*, § 2.12. Now, of course, the Colts are no longer in Maryland, nor would they be here at the time of judgment were this case to go to trial. The inescapable conclusion is that the franchise is beyond the jurisdictional reach of Baltimore City.

█ Even if this were not the case and the Court were to adopt the March 30, 1984 date urged by the City, the Court finds that the City did not have the power to condemn the franchise on that date. Under any workable test for determining the situs of the franchise on that date, the Colts franchise had left Maryland by the time the City instituted the condemnation proceedings.

B. *The Appropriate Standard for Determining the Situs of an Intangible*

1. *"Minimum Contacts" Analysis.*

The City asserts that its power of eminent domain is coextensive with this Court's personal jurisdiction over the Indianapolis Colts. City's Brief at 2. Relying on *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and the doctrine of "minimum contacts" of personal jurisdiction, the City argues that since the Colts had sufficient contacts with the state of Maryland both before and after March 30, 1984 for this Court to assert jurisdiction over the team, the City therefore has power to condemn the club. City's Brief at 30–31.

█ The Colts respond, and the Court agrees, that the minimum contacts required for personal jurisdiction are inadequate for jurisdictional purposes in eminent domain. A state's power of eminent domain is, by its very nature, exclusive of another state's power to condemn the same property. 1 *Nichols*, § 2.12. In order to avoid conflicting judgments with respect to the same property, only one state may condemn a particular piece of property, whether tangible or intangible. *Cf. Western Union Telegraph Co. v. Pennsylvania*, 368 U.S. 71, 82 S.Ct. 199, 7 L.Ed.2d 139 (1961) (only one state may escheat intangible property).

Personal jurisdiction, in contrast, involves an entirely different analysis. The courts of many different states could have the power to assert jurisdiction over a party if that party has sufficient contacts with those states to satisfy the dictates of due process. *International Shoe*, 326 U.S. at 316, 66 S.Ct. at 158, *World-wide Volkswagon Corp. v. Woodson*, 444 U.S. 286, 291–92, 100 S.Ct. 559, 564–65, 62 L.Ed.2d 490 (1980). The exercise of personal jurisdiction is a non-exclusive power; that is, it does not conflict with another court's exercise of jurisdiction if minimum contacts also exist in another forum.

The adoption of the City's "minimum contacts" analysis would lead to an untenable precedent. Any state whose courts could assert jurisdiction over the parties could condemn the property in question. Sports franchises, which have minimum contacts with many jurisdictions in this country, could be condemned by any state in which the teams play. At oral argument, counsel for the City conceded that the "minimum contacts" standard would permit the condemnation of the Colts franchise by Delaware as the state of incorporation, by Illinois as the state in which the corporate offices are located, and even by Florida, since the Colts play a football game in Miami each year. Under the same theory, Maryland, as the state of incorporation of the Washington Redskins, would have the requisite minimum contacts to condemn the Redskins in order to replace

the lost Colts franchise. Counsel asserted that the resulting chaos could be alleviated by the award of the franchise by the Courts to the jurisdiction which filed its condemnation proceeding first.

The Court finds the City's legal theory totally unacceptable and inapplicable. Such a rule would eviscerate the established rule that only one sovereign may properly condemn property, and would lead to the exercise by a foreign state of extraordinary powers over property located in another state.

### 2. *Situs of a sports franchise under City of Oakland v. Oakland Raiders.*

The only judicial authority of which the Court is aware that addresses the question of the situs of a sports franchise for condemnation purposes is the California decision involving the efforts of the City of Oakland to condemn the NFL franchise and related properties of the Oakland Raiders. *City of Oakland v. Oakland Raiders*, 32 Cal.3d 60, 183 Cal.Rptr. 673, 646 P.2d 835 (1982). In that case, unlike the case before this Court, the City of Oakland had commenced the condemnation proceedings while the team was still located in Oakland, before relocation to Los Angeles.

Among the issues in that case was whether or not the Raiders' franchise and related intangible property rights had their situs within the Oakland city limits and accordingly, whether Oakland's suit was barred by a state statute preventing municipalities from condemning property outside their territorial limits. The trial court granted summary judgment dismissing Oakland's eminent domain action, and the City appealed. In its opinion reversing the trial court, the California Supreme Court noted that in fairness, the power of condemnation must have reasonable limitations. *Id.* at 682, 646 P.2d at 844. Turning, then, to the factors it thought relevant in determining the situs of the Raiders' franchise and other intangible property, the court observed: "Oakland is the principal place of business of the partnership [the owner of the team]. It is the designated NFL-authorized site for the team's 'home games.' It is the primary locale of the team's tangible personalty." *Id.* The court concluded that the territorial restrictions of the state statute had been satisfied and remanded the case for a trial. *Id.*

An application of those factors to this case provides useful guidance and supports the Court's conclusion that the franchise was not in Maryland on March 30, 1984. First, the Court engaged in extensive inquiry at an earlier date into the team's principal place of business on March 30. There is no dispute that on that date the team's corporate books and records, financial records and files, office furniture and supplies, airplane, coaching materials, and film files were in Indianapolis. As this Court has already determined in consideration of an earlier motion, "no further day-to-day business was conducted in Maryland [after March 28]. Whatever business the team conducted on March 30, such as negotiating leases, issuing press releases, planning for the upcoming season and coordinating this litigation, those activities took place in a state other than Maryland. ... Once the Colts abandoned Maryland, activity in Maryland ended." Opinion of June 22, 1984, Colts' Motion, App. 4.

Second, there is no dispute that the majority of the team's physical possessions were not in Maryland on March 30, 1984. The Mayflower vans which transported the team's property to Indianapolis on March 28–29 removed most of the tangibles "necessary" and "valuable" to the operation of the team. *See* Deposition of Michael Chernoff at 237, Colts' Motion, App. 2. The Court finds this act of physical relocation, however unpopular in Baltimore at the time, to be of great significance to our inquiry here. Indeed, if the move to Indianapolis had not taken place until after March 30, the location of the team's tangible personal property, although of small value, would have been a potent factor in the city's position on situs of the franchise.

Concerning the question of the NFL designated site for the team's home games, the Court does not find this factor to be

particularly significant on the facts of this case. Certainly as of March 30 (still in the off-season), Baltimore was the designated site of the Colts' home games, at least as far as the NFL's records indicate. However, the NFL was aware of a possible Colts' move, and had decided to take no action in that regard (*see* III.A. *infra*). In a situation where the NFL decided not to act, it is hardly probative to determine the NFL designated home site on a date in the off-season when the team had just completed its attempt to relocate the franchise.

### 3. *Situs of Intangibles in the Law of Escheat*

Both the City and the Colts rely heavily on the law of escheat in their argument as to the determination of situs. In escheat proceedings, the state takes title to property abandoned by its owner; they are in some senses highly analogous to condemnation proceedings. Moreover, the Supreme Court has addressed squarely the issue of the determination of situs of intangible property in the law of escheat.

The City urges, in support of its "minimum contacts" argument, that under *Connecticut Mutual Life Insurance Co. v. Moore*, 333 U.S. 541, 68 S.Ct. 682, 92 L.Ed. 863 (1948) and *Standard Oil v. New Jersey*, 341 U.S. 428, 71 S.Ct. 822, 95 L.Ed. 1078 (1951), "a state may assert title to intangible property as long as minimum contacts exist between the holder of the *res* and the state consistent with the dictates of due process." City's Brief at 31–32. In *Connecticut Mutual*, nine insurance companies incorporated in states other than New York sued to enjoin the state of New York from taking custody of unclaimed proceeds of insurance contracts issued on the lives of New York residents. The Supreme Court held that New York had the constitutional power to seize the property based on its contacts with the intangible property. "The question is whether the State of New York has sufficient contacts with the transactions here in question to justify the exertion of the power." *Id.* at 548, 68 S.Ct. at 687; City's Brief at 32.

Similarly in *Standard Oil*, 341 U.S. 428, 71 S.Ct. 822, New Jersey escheated unpaid dividends of the stock of Standard Oil Company, a New Jersey corporation, which held the stock of unlocated or deceased and intestate shareholders. Standard Oil challenged this action on the basis that New Jersey lacked the power to escheat the property in question. The Supreme Court ruled in favor of New Jersey, stating that "where the debtor and creditor are within the jurisdiction of a court, that court has constitutional power to deal with the debt." *Id.* at 439, 71 S.Ct. at 829.

The City relies on these two cases to argue that under the law of escheat, situs of intangible property is determined by the same jurisdictional analysis of minimum contacts mentioned in I.B.1, *supra*. "Because personal jurisdiction exists here, the Club's NFL franchise is 'within' this jurisdiction and subject to the City's power of eminent domain." City's Brief at 34.

Beyond the deficiencies of the "minimum contacts" analysis as applied to condemnation proceedings (*see* I.B.1, *supra*), the Court doubts that the cases upon which the City relies are still viable in light of more recent Supreme Court cases. As the Colts correctly point out, *Connecticut Mutual* and *Standard Oil* are part of a series of Supreme Court cases over a 40-year period. Reply Memorandum of Indianapolis Colts ("Colts' Reply") at 4. Two cases decided after *Connecticut Mutual* and *Standard Oil* make it clear that the Supreme Court has abandoned the minimum contacts/due process analysis the City urges the Court to adopt.

In the first, *Western Union Telegraph*, 368 U.S. 71, 82 S.Ct. 199, Pennsylvania sought to escheat monies representing uncashed refunds arising from transactions that originated in Pennsylvania. The Court held that Pennsylvania could not escheat the funds in question because they might be subject to escheat under the laws of some other state. *Id.* at 74, 82 S.Ct. at 200. In short, the Court was recognizing the *exclusive* nature of escheat—and by analogy, condemnation—proceedings.

Finally, in *Texas v. New Jersey*, 379 U.S. 674, 85 S.Ct. 626, 13 L.Ed.2d 596 (1965), the Supreme Court opted for a bright-line rule that would put the question to rest. It adopted a variation of the concept of *mobilia sequuntur personam* ("moveables follow the person"), according to which intangible personal property is found at the domicile of its owner, and held that the power to escheat intangible property could be exercised only by the state of the owner's last known address. The question was which state, Texas or New Jersey, could escheat small debts owed by the Sun Oil Company. The Court, for purposes of "ease of administration," adopted the last-known address rule. *Id.* at 683, 85 S.Ct. at 631. In so doing, it implicitly abandoned the precedents upon which the City's "minimum contacts" argument rests. *See* Dissenting Opinion of Justice Stewart, 379 U.S. at 683, 85 S.Ct. at 631.

Thus, if this Court were to adopt the analysis of determining the situs of intangible property applied in the law of escheat, the last known address of the owner of the property would determine which state had the power to condemn. The application of this mechanical rule could lead to different results. The last address of the Colts on March 30, 1984 might be Indianapolis, if in fact they were conducting business from that location at that time. It might be Skokie, Illinois, the site of the Colts' headquarters, if they were "gone" from Maryland but not yet in Indiana. Or, indeed, the last known address might be Maryland, if no permanent address had been established in Indiana.

In the Court's opinion, however, the mechanical rule of last-known address is not controlling in the determination of the situs of the franchise. Unlike escheat proceedings, where the location of the owner of property is usually unknown, condemnation proceedings simply require the court to determine where, among two or more possible choices, the property was located on a given date. In this proceeding, for example, the owner is known, and the movement of the property over time can be traced. The helpfulness of the escheat analogy is primarily in its explication of the exclusivity of the proceedings, i.e., that only one state can take the property. Beyond that, the analogy begins to lose its force. It would seem anomalous indeed for this Court to determine, for example, that under the last-known address rule, the franchise was neither in Maryland nor Indiana but Illinois.

\* \* \*

After careful analysis of the authority cited by both parties, the Court is persuaded that, under any workable test for determining the situs of a sports franchise, the Colts were out of Maryland on March 30, 1984. Three factors strongly support this conclusion. First, as noted above, the principal place of business of the team was "not in Maryland" at that time. Second, the location of the team's essential tangible property—as well as its certificate of membership in the NFL—were in Indianapolis by March 30. Third, there can be no question that Irsay's intention was that the Colts be outside the jurisdiction of Maryland by the time any eminent domain action was filed. To the extent that intent helps determine the situs of the franchise under the concepts of corporate domicile and *mobilia sequuntur personam*, it strongly supports the conclusion that the Colts were not in Maryland. In light of these factors, the Court cannot find that the Colts were somehow still in Maryland as of March 30, 1984.

The Court stresses that the above analysis was not required since the Colts have prevailed on the threshold issue of the appropriate date for determining the situs of the franchise. Even assuming, however, that the City's argument for March 30, 1984 is correct, the Court finds that the intangible NFL franchise was outside the jurisdiction and beyond the power of Baltimore City to condemn on that date. Whether one follows the *Raiders* test for determining the situs of a franchise, the escheat precedents, or the three factors articulated above, there is no avoiding the conclusion that "the Colts are gone."

### III. SUMMARY JUDGMENT

The City argues that summary judgment is inappropriate here because substantial disputed questions of material fact remain to be tried. City's Brief at 50. Specifically, the City asserts that issues of fact exist as to the NFL's March 2, 1984 meeting, the team's continuing contacts with Maryland after March 30, 1984, and the team's operations in Indianapolis before the March 30 filing. Citing *Ross v. Communications Satellite Corp.*, 759 F.2d at 364, and Rule 56(c) of the Federal Rules of Civil Procedure, the City points out that all evidence must be viewed in the light most favorable to the non-moving party. City's Brief at 52.

For the reasons discussed below, the Court rejects the City's position that substantial issues of fact remain in this case. To the contrary, there is very little dispute as to what happened on the dates in question; rather, the dispute only relates to the legal conclusions that the parties draw from those facts. Accordingly, the Court views this case as particularly appropriate for summary judgment.

### A. *The March 2, 1984 Meeting of the NFL*

In its privileged executive session of March 2, 1984, the NFL owners discussed the ramifications of the Raiders antitrust decision, particularly as it might apply to any attempt of the League to block a possible move of the Colts. Of particular importance here is the legal effect of Article 4.3 of the NFL Constitution and By-Laws, which provides in pertinent part as follows: "League Control of Games. ... No member club shall have the right to transfer its franchise or playing site to a different city, either within or outside its home territory, without prior approval by the affirmative vote of three-fourths of the existing mem-

ber clubs of the League." Colts' Motion, App. 7 at 9.

The Colts assert that the League's decision to express neither approval nor disapproval of Irsay's possible move constituted a waiver or suspension of Article 4.3. After a careful review of the record, the Court agrees. The official minutes of that session indicate that "the suspension of Article 4.3 of the Constitution and By-Laws ... would continue, pending clarification of the anti-trust laws or other developments." Colts' Motion, App. 10, p. 2. The deposition testimony of Commissioner Rozelle further establishes the unambiguous decision of the meeting. "So what [the League] decided to do was to waive the provisions of 4.3 and to say that it was a Colt decision.... We suspended the provision in that case." Rozelle Deposition, Colts' Motion, App. 9 at 44.

The Court concludes that the League did exactly what the minutes indicate—waive the provision—particularly in light of the fact that only a few days before, the United States Court of Appeals for the Ninth Circuit had found the very same provision illegal. *See Los Angeles Coliseum*, 726 F.2d at 1398. Nor do any of the City's arguments in this regard diminish the clarity of what transpired at the meeting. For example, the fact that several of the owners remember little from the meeting or can recall only that no actual vote was taken to suspend Article 4.3 (City's Brief at 16–17) does not contradict the view of the official minutes or of the Commissioner. While some memories of the meeting might be poor, there is nothing in the record to indicate that something different happened at the March 2 meeting. Whether by actual vote or "just lack of dissent" (Rozelle Deposition at 44), it is beyond dispute that the NFL waived Article 4.3 insofar as it applied to the move of the Colts.[3] *See also*

---

3. The City argues that the fact that the NFL attempted to enforce Article 4.3 against a contemplated move of the Philadelphia Eagles franchise demonstrates that Article 4.3 had not been waived or at least creates an issue of material fact. City's Brief at 61. The Court disagrees. The facts of the Philadelphia case are, of course, entirely separate from the facts here, and nothing in the Eagles case controverts the fact that, as applied to the Colts nine months earlier, the provision was waived. In fact, the League's action against the Eagles transfer lends evidentiary support to the waiver in the Colts transfer.

NFL's Answers to the City's Interrogatories, Colts' Motion, App. 12 and 13.

### B. *The Team's Contacts with Maryland after March 30, 1984*

The City also asserts that the Colts' lingering contacts with the state of Maryland create an issue of fact as to whether the team "had left this jurisdiction as of March 30." City's Brief at 64. Of course, this argument depends heavily on the "minimum contacts" theory of eminent domain jurisdiction, which the Court has already discussed and rejected.

The Court sees no issue of fact in the question of the team's lingering contacts with Maryland. Both parties agree that the Colts still had a stadium lease of Memorial Stadium as of March 30, 1984, a lease agreement of their Owings Mills training complex, a lease of certain facilities in Westminster, Maryland, broadcasting contracts in Maryland through April, 1984, as well as four commercial checking accounts. *See e.g.*, Colts' Reply at 28–31. None of those facts are in dispute.

The existence of the Colts' contacts with Maryland through various winding-up activities does nothing to change the Court's analysis that Maryland was not the team's situs on March 30, 1984. Accepting all the facts of the winding-up activities as they have been presented by the City, there is no dispute as to what had left Maryland and what remained.

### C. *The Colts' Business in Indianapolis on March 30, 1984*

Finally, the City attempts to refute the Colts' argument that the team was conducting football business in Indianapolis on March 30, 1984. Citing the uncontroverted facts that the team had "played no games, sold no tickets, conducted no advertising, entered no player, broadcast or supply contracts and employed no staff in Indiana," the City argues that the fact that the team was not yet fully operative out of its Indianapolis offices also creates an issue of fact as to the franchise's location. City's Brief at 64–65. The City also notes that the Colts had no stadium lease agreement for the Hoosier Dome as of March 30 and were not licensed to do business in Indiana until April 5, 1984.

Accepting all of these facts as presented by the City, it is beyond dispute that whatever football business the team was conducting on March 30, 1984 was being conducted in Indianapolis. Indeed, the Court has, at an earlier date, recited many of the Colts' activities in Indianapolis on March 29, 1984, including the arrival of key personnel and the installation of the team's records and files. *See* Opinion of June 22, 1984, Colts' Motion, App. at 10. The fact that the business was not completely in place at its new location does nothing to refute the reality that whatever business the Colts conducted on March 30, 1984 took place in Indianapolis—not in Maryland. Again, none of the relevant facts of this issue are in dispute. Both parties agree as to what remained in Maryland and what was happening in Indianapolis. Only the legal conclusions differ, and as a result, the case is ripe for a decision on summary judgment.

### IV. CONCLUSION

For the foregoing reasons, the Court finds that Baltimore City lacks the power to condemn the Colts' franchise. Until the City pays the owner compensation for the property taken, it has no right under Maryland law to restrict the owner from moving that property beyond the jurisdiction of the state.

Even if the applicable date for determining the situs of the franchise were the date of the filing of the condemnation petition rather than the date of payment of compensation, the Court reaches the same conclusion. The team's principal place of business and its tangible property were both outside Maryland on that date, and it is clear that the owner's intention was to relocate outside of Maryland. Under any of the workable tests for determining the situs of the franchise, the Court concludes that the Colts were "gone" on March 30, 1984.

There are no outstanding issues of material fact that would preclude the Court from deciding the matter on summary judgment. Accordingly, the Colts' pending motion—being treated as a motion for summary judgment—will be granted, and the Court will enter a formal order consistent with this opinion.